1 | Todd C. Ringstad (State Bar No. 97345)
Christopher A. Minier (State Bar No. 190705)
2 | RINGSTAD & SANDERS, LLP
2030 Main Street, 12th Floor
3 | Irvine, CA 92614
Telephone: 949-851-7450
4 | Facsimile: 949-851-6926

5 | Counsel for interested party James Myron,
individually and as trustee of the James Myron Trust
6 | dated April 12, 2001

7 |

```
┌─────────────────────────────┐
│         FILED               │
│      MAR 11 2009            │
│ CLERK U.S. BANKRUPTCY COURT │
│ CENTRAL DISTRICT OF CALIFORNIA │
│ BY:              Deputy Clerk │
└─────────────────────────────┘
```

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

10 |

11 | In re | CASE NO. 2:09-10549 ER

12 | **THE OLYMPIC ON GRAND, LLC, a California limited liability company,** | In a Case Under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 1101 et seq.)

13 |

14 | Debtor and Debtor-in-Possession. | **EMERGENCY MOTION BY JAMES MYRON FOR AN ORDER:**
15 | | **(1) TERMINATING DEBTOR'S PERIODS OF EXCLUSIVITY FOR THE FILING OF A PLAN AND OBTAINING ACCEPTANCE THEREOF, SO AS TO PERMIT THE FILING OF A PLAN BY JAMES MYRON; AND (2) EXTENDING THE DEADLINE FOR THE FILING OF A PLAN AND DISCLOSURE STATEMENT; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF JAMES MYRON AND OF DANIEL C. HALES**
16 |
17 |
18 |
19 |
20 |
21 |
22 | | **Hearing:**
23 | | Date: [TO BE SET]
Time: [TO BE SET]
24 | | Place: Courtroom 1568
255 East Temple Street
25 | | Los Angeles, California 90012
26 |
27 |
28 |

Ringstad & Sanders
LLP
2030 Main Street, 12th Floor
Irvine, California 92614
949-851-7450

ORIGINAL

1  **TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES**

2  **BANKRUPTCY JUDGE:**

3      By this Motion, secured creditor and interested party James Myron, individually and as

4  trustee of the James Myron Trust dated April 12, 2001 (hereafter collectively "Myron") hereby

5  moves the Court on an emergency basis for an Order:

6      (1)    Terminating the exclusivity periods set forth in 11 U.S.C. § 1121(b) and (c)

7  for the filing of a Plan and Disclosure Statement by The Olympic on Grand, LLC, a

8  California limited liability company, debtor and debtor-in-possession herein ("Debtor"),

9  such that Myron shall be permitted to propound a Plan and Disclosure Statement, and

10  solicit acceptance thereof, notwithstanding the non-expiration of the exclusivity periods;

11  and

12      (2)    Extending the deadline for the filing of a Plan and Disclosure statement for

13  a period of 60 days beyond the March 16, 2009, deadline established by the Court at the

14  February 10, 2009, hearing on the motions of Vineyard Bank, N.A. ("Vineyard Bank");

15  without prejudice to the ability of parties in interest to obtain further extensions upon

16  providing a progress report to the Court and interested parties.

17  **<u>SUMMARY OF MOTION AND REASON FOR EMERGENCY RELIEF</u>**

18      The Debtor owns commercial real property located at 1020 - 1024 South Grand Avenue,

19  Los Angeles, California (hereafter the "Property"). In or about November of 2005, Debtor

20  acquired title to the Property from James Myron in a complex sale transaction. The total

21  purchase price for the Property was $30 million. Myron financed a portion of the purchase by

22  carrying back a $17,500,000 note secured by a subordinated deed of trust against the property.

23  Myron also received an ownership and profit participation interest in the Debtor and its project to

24  redevelop the Property as part of the sale consideration. Therefore, Myron is one of the Debtor's

25  members, owing a 20% interest in the Debtor.

26

27

28

Ringstad & Sanders
L.L.P.
2030 Main Street, 12ᵗʰ Floor
Irvine, California 92614
(949) 851-7450

1    Vineyard Bank, N.A. (hereafter "Vineyard Bank") is the beneficiary under a first priority

2    Deed of Trust on the Property, which secures Debtor's repayment of a loan in the amount of

3    $18,000,000.

4    On February 10, 2009, at a hearing on two motions filed by Vineyard Bank, the Court

5    stated in a tentative ruling and orally at the hearing that Debtor must file a Plan and Disclosure

6    Statement by March 16, 2009, or the Court "may in its discretion dismiss the case or appoint a

7    chapter 11 trustee." It does not appear from a review of the ECF docket that any written order

8    embodying this portion of the Court's ruling has been entered.

9    The parties presently in control of the Debtor and its bankruptcy case have engaged in a

10    long history of self-dealing, malfeasance, and the mismanagement and waste of the Debtor's

11    assets. In light of this, Myron has absolutely no confidence in the Debtor's current

12    management, or the ability of Debtor's current management to formulate and propound a

13    confirmable Plan on a timely basis.

14    Further, it now appears certain that Debtor's current management cannot and/or will not

15    timely propound a Plan and Disclosure Statement by the Court's March 16, 2009, deadline. On

16    March 5, 2009, Debtor filed an Ex Parte Motion for an Order Continuing the Plan and

17    Disclosure Statement Filing Deadline. Thus, the unwillingness and/or inability of Debtor's

18    current management to timely file a Plan is jeopardizing Debtor's reorganization and Myron's

19    considerable interests in the Debtor and its Property, as well as the interests of all other

20    creditors. Myron, as well as other secured and unsecured creditors, should not be prejudiced by

21    Debtor's unwillingness and/or inability to timely propound a Plan.

22    Instead, the Court should find that Debtor's failure to file a Plan and Disclosure

23    Statement by the Court's March 16, 2009, deadline constitutes ample cause for granting the

24    limited termination of the Debtor's exclusivity periods in order to permit Myron to file a Plan.

25    Moreover, Myron has made considerable progress in the development of his own

26    reorganization plan, and is willing to commit his personal funds toward making Debtor's

27    reorganization successful. The Plan that will be propounded by Myron will provide for the

28    development of the property with 210 to 236 apartments with mixed retail space, to be financed

Ringstad & Sanders
LLP
2030 Main Street, 12th Floor
Irvine, California  92614
949.851.7450

1   by a construction loan from the United States Department of Housing and Urban Development

2   ("HUD"). The Plan will provide for monthly interest payments to be made to Vineyard Bank

3   until its encumbrance on the Property is satisfied in full.

4        Myron has already assembled an accomplished development team, consisting of a

5   developer, architects, engineers and financiers who have collectively been responsible for the

6   successful entitlement and development of numerous high-rise buildings in downtown Los

7   Angeles.  This development team has already begun the process of obtaining necessary

8   approvals for the development of the Property. Myron has submitted an application to HUD for

9   a loan that would provide the funds necessary for the redevelopment of the Property, and

10  Myron has paid from his personal funds a $40,000 fee associated with obtaining HUD funding.

11       Myron is willing to use commit the resources necessary to pay the estimated $1.4

12  million needed to obtain full development entitlements on the Property.  Further, Myron is

13  willing to pay monthly non-default contractual interest to Vineyard Bank pending Plan

14  confirmation.

15       Furthermore, as set forth in detail in the attached Declaration of Myron, Myron is

16  entitled to serve as a co-manager of the Debtor LLC under the terms of the purchase agreement

17  pursuant to which the Debtor acquired the property and is being improperly excluded from

18  Debtor's management.  If he were not being improperly excluded from management, Myron

19  would able to file a Plan on the Debtor's behalf.

20       Each of the foregoing facts constitutes good and sufficient cause for the Court to grant

21  the limited termination of the Debtor's exclusivity periods so as to permit Myron to file and

22  Plan and Disclosure Statement, and Myron further respectfully requests that the Court continue

23  the March 16, 2009 Plan and Disclosure Statement filing deadline for a period of 60 days in

24  order to permit Myron to file a Plan.

25       This Motion is based upon the Memorandum of Points and Authorities set forth below,

26  the attached Declarations of James Myron and Daniel C. Hales, and exhibits, attached hereto, all

27  pleadings, papers, documents and exhibits filed in support of this Motion, any oral or written to

28  testimony provided at the hearing on this Motion, and such other and further evidence as may be

Ringstad & Sanders
LLP
2010 Main Street, 12th Floor
Irvine, California 92614
949 851.7450

- 4 -

1 │ presented to the Court at or prior to the hearing on this Motion.

2 │ **WHEREFORE**, Debtor respectfully requests that this Court enter an Order:

3 │ (1)  Modifying the exclusivity periods set forth in 11 U.S.C. § 1121(b) and (c)

4 │ for the filing of a Plan and Disclosure Statement by Debtor, such that Myron shall be

5 │ permitted to forthwith propound a Plan and Disclosure Statement, and to solicit

6 │ acceptance thereof;

7 │ (2)  Extending the deadline for the filing of a Plan and Disclosure statement for

8 │ a period of 60 days beyond the March 16, 2009, deadline established by the Court in

9 │ connection with the February 10, 2009, hearings on the motions of Vineyard Bank,

10 │ without prejudice to the ability to obtain further extensions upon providing a progress

11 │ report to the Court and notice to interested parties; and

12 │ (3)  For such other and further relief as the Court deems just and proper.

14 │ Respectfully submitted,

15 │ DATED:  March **10** , 2009       RINGSTAD & SANDERS LLP

17 │ By: _____

18 │ Todd C. Ringstad
   │ Christopher A. Minier
19 │ Counsel for James Myron, individually and
   │ as trustee of the James Myron Trust dated
20 │ April 12, 2001

*Ringstad & Sanders*
*L.L.P.*
*2030 Main Street, 12th Floor*
*Irvine, California  92614*
*949.851.7450*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

The Debtor in this case, The Olympic on Grand, LLC (hereafter "OOG" or "Debtor"), is a California limited liability corporation that currently owns real property located at 1020 - 1024 South Grand Avenue, Los Angeles, California (hereafter the "Property"). This Motion is brought by the James Myron, individually, and as trustee of the James Myron Trust dated April 12, 2001 (collectively "Myron"). Myron is one of the members of the Debtor as well as one of Debtor's secured creditors.

**A.    The Property.**

From 1946 until 2005, the family of James Myron had owned the Property. The Property consists of approximately 58,300 square feet of land improved with one or more structures comprising a nightclub and parking lot. James Myron's mother, Myrna Myron, was a former chorus girl and she originally purchased the Property to operate a nightclub for dancers and bands in the Big Band Era. The nightclub survived the end of the Big Band Era and has reinvented itself as a concert venue and nightclub for more than sixty years.

In 2005, Myron held title to the Property and listed it for sale. During the last quarter of 2005, Myron was approached by Richardson Robertson III and Mark Abrams, who represented themselves as developers and expressed an interest in purchasing the Property in order to redevelop it into two luxury, mixed-use, high-rise condominium towers over retail space.

Richardson Robertson III is a licensed architect. Richardson Robertson III is the owner and/or an officer of entities known as Richardson Robertson & Associates, Inc. ("RRA"), and Beaux Arts, LLC ("Beaux Arts"). Richardson Robertson III and RRA were to be the architect / designer of the proposed redevelopment project. Hereafter Richardson Robertson III, RRA and Beaux Arts shall be collectively referred to as "Robertson."

In late 2005, Myron reached an agreement to sell the Property to an entity controlled by Mark Abrams and Robertson ("RPI"). Pursuant to the sale terms, the Property was sold for a price of $30 million. Myron agreed to loan RPI a portion of the money towards the total

- 6 -

1  purchase price ($17,500,000) pursuant to a promissory note and deed of trust subordinated to a

2  senior encumbrance securing a loan to be obtained from a bank.  Additionally, Myron would

3  receive an ownership and profit participation interest in the development project.  Under these

4  modified terms, Myron agreed to sell the Property to RPI.

5      Debtor was formed on or about November 19, 2005.  In connection with the closing of the

6  Sale Agreement, Debtor took title in the Property.  The Renaissance on Grand, LLC, a California

7  limited liability company ("Renaissance"), is the present managing member of the Debtor.  In

8  turn, The Titan Organization, Inc., a California corporation ("Titan"), is the sole owner and

9  managing member of Renaissance.  Robertson is currently Titan's majority shareholder, and he

10 recently installed himself as Titan's President, sole, Director, Chief Financial Officer and

11 Secretary.

12     There are three separate classes of ownership interests in the Debtor.  Myron is the sole

13 Class "B" member, owning a 20% interest in the Debtor.  Renaissance is the managing member

14 and sole Class "A" member, owning a 57.5% interest in the Debtor.  Renaissance is an entity that

15 is wholly owned by Titan.  Titan is the managing member of Renaissance.  Robertson is currently

16 in control of Titan.  There are also three Class "C" members who collectively own a 22.5%

17 interest the Debtor.

18     In connection with the Sale Agreement, Debtor obtained a loan with Preferred Bank as its

19 primary mortgage for the Property, in the amount of $12,800,000.  The Preferred Bank loan was

20 subsequently replaced, in May 2007, by a loan in the amount of $18,000,000 by Vineyard Bank,

21 N.A. ("Vineyard Bank"), as the primary mortgage for the Property, and secured by a First Deed

22 of Trust recorded against the Property.

23     The present encumbrances against the Property are (not including accrued interest and

24 charges):

25     1st TD    Vineyard Bank    $18,000,000

26     2nd TD    LVF    $ 3,000,000  (up to $3 million)

27     3rd TD    Myron    $17,500,000

28

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949.851.7450

**B.    Robertson's Undisclosed Self-Dealing Transactions with the Debtor and Unlawful Exclusion of Myron from Management.**

Myron subsequently learned that even before the close of the Purchase Agreement, and for over a year afterward, Robertson had failed to disclose to Myron that Debtor had entered into contracts with Robertson's company, RRA, providing for Debtor to pay Robertson and/or RRA extravagant levels of compensation and reimbursement of expenses. See Declaration of Myron at ¶¶ 23-31, 44-61. The acts of Robertson and RRA described in detail in the attached declaration constitute fraud, dishonesty and gross mismanagement of the Debtor's assets, and resulted in Robertson enriching himself in the amount of at least $3.15 million at the Debtor's expense. See Declaration of Myron at ¶¶ 23-31, 44-61.

Under Paragraph 5 of the 2nd Amendment to the Operating Agreement, Myron is to be a co-manager of the Debtor. See Declaration of Myron, at ¶ 15.

Moreover, Robertson is now asserting exclusive control of the Debtor and is unlawfully denying Myron, the rightful co-manager of the Debtor, the right to exercise his rights as a co-manager and to function as a co-manager of the Debtor. See Declaration of Myron at ¶¶ 15, 30-37, 42-43.

**C.    The Improper and Inept Conduct of Robertson in Debtor's Bankruptcy Cases Places Myron, the Other Members of the Debtor and the Creditors at Risk that the Valuable Property will be Lost and their Interest Irreparably Damaged.**

Following the maturity date of its loan with Vineyard Bank, Debtor was unable to repay or refinance this first priority loan. On July 2, 2008, Vineyard Bank filed a foreclosure action against Debtor in Los Angeles County Superior Court (*Vineyard Bank, N.A. v. The Olympic on Grand, LLC, et al.*, Case No. BC393730). On July 16, 2008, the Los Angeles County Superior Court entered an order appointing Robb Evans & Associates, LLC (hereafter the "Receiver"), as receiver of the Debtor's real Property. Since his appointment, the Receiver has at all times been in possession and control of the Property.

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

1    Subsequently, on July 9, 2008, Vineyard Bank recorded a Notice of Default and Election

2    to Sell under the Deed of Trust. On or about November 17, 2008, Vineyard Bank published a

3    Notice of Trustee's Sale in order to auction the Property at a foreclosure sale. [Exhibit "12"].

4    In an effort to financially reorganize the Debtor and the project, Myron proposed, and all

5    of Debtor's members, save for Renaissance (which was recently hijacked by Robertson), voted to

6    file a petition for reorganization under Chapter 11 of the United States Bankruptcy Code under

7    Myron's authority as co-managing member. On behalf of Titan, Robertson refused to cooperate

8    with the request of all of Debtor's co-members, including Myron. See Declaration of Myron at ¶

9    35.

10   Instead, acting alone and without soliciting the consent of Debtor's co-members,

11   Robertson caused Debtor, a California limited liability company, to improperly file an *in propria*

12   *personam* Chapter 11 petition on December 9, 2008. Robertson was the sole signatory of the

13   Debtor's bankruptcy petition. This bankruptcy case commenced by Robertson for the Debtor was

14   commonly known as *In re The Olympic on Grand, LLC,* U.S.B.C. Case No. 2:08-31345 ER

15   (hereafter Debtor's "First Bankruptcy Case"). See Declaration of Myron at ¶ 36.

16   In light of Debtor's improper filing of its First Bankruptcy Case caused by Robertson, on

17   December 15, 2008, the United States Trustee filed a motion to dismiss Debtor's First

18   Bankruptcy Case for cause under 11 U.S.C. § 1112(b), on the grounds that the filing violates

19   Local Bankruptcy Rule 2090-1(g)(1) which provides, "[a] corporation, partnership or

20   unincorporated association may not file a petition or otherwise appear without counsel in any case

21   or proceeding…." See Declaration of Myron at ¶ 37.

22   Although the manner in which Robertson commenced Debtor's First Bankruptcy Case

23   may have been technically improper, the refiling of a chapter 11 case was in the best interests of

24   all interested parties. Vineyard Bank had rescheduled its foreclosure sale of the Debtor's real

25   Property for January 13, 2009. Thus, on January 12, 2009, the day before Vineyard Bank's

26   rescheduled foreclosure sale of the Property, Robertson (this time with the aid of counsel) caused

27   the Debtor to commence the instant Chapter 11 case.

28   On January 22, 2009, Vineyard Bank filed two motions. In one of its motions, Vineyard

- 9 -

1    bank sought relief from the automatic stay so as to permit the continued administration of the

2    receivership estate.  It should be noted that in its stay relief motion, Vineyard Bank did not seek

3    relief from the automatic stay to permit it to conclude a trustee's foreclosure sale of the Property.

4    Vineyard Bank's second motion sought an order excusing the receiver from complying with his

5    obligations to turnover bankruptcy estate property under 11 U.S.C. § 543(a)-(c).

6        On February 10, 2009, hearings were held on Vineyard Bank's foregoing motions.

7    Ultimately, the Court granted Vineyard Bank's motion for an order excusing the receiver from

8    complying with his obligations to turnover bankruptcy estate property under 11 U.S.C. § 543(a)-

9    (c).  The Court also continued the hearing on Vineyard Bank's motion for relief from the

10   automatic stay to March 23, 2009.  In connection with the hearings on Vineyard Bank's motions,

11   the Court issued a tentative ruling that provides, in relevant part:

12           For the reasons set forth below, the Court grants the motion to excuse

13       turnover, continues the hearing on relief from stay to March 23, 2009 at 10:00.

14       The Court further orders that if a plan and disclosure statement are not on file by

15       March 16, 2009, the Court may in its discretion dismiss the case or appoint a

16       chapter 11 trustee.

17           ***

18           The Declaration of Richardson Robertson III filed in opposition to the

19       motion for relief from stay states that "[a] comprehensive plan will be filed by

20       March 15, 2009." Robertson Decl. at para. 3.  March 15 is a Sunday.  Therefore,

21       taking this to mean that a plan and disclosure statement will be on file by March

22       16, 2009, the Court will continue the motion for relief from stay to march 23,

23       2009 at 10:00 a.m... Further, if a plan and disclosure statement are not on file by

24       March 16, 2009, the case will be dismissed or a chapter 11 trustee shall be

25       appointed, at the discretion of the Court. [Exhibit "19"].

26       By way of the instant motion, Myron respectfully requests that the Court continue the

27   March 16, 2009, Plan and Disclosure Statement filing deadline set forth in the Court's tentative

28   ruling by a period of 60 days, i.e., to and including May 15, 2009, so as to permit Myron to file a

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
(949) 851-7450

1    Plan. Myron further requests that the continuance of the Plan and Disclosure Statement filing

2    deadline be without prejudice to Myron's ability to seek further extensions of time upon

3    providing a progress report to the Court and notice to interested parties.

## II.

### THE COURT MAY TERMINATE EXCLUSIVITY TO ALLOW
### A PARTY OTHER THAN THE DEBTOR TO FILE A PLAN

7    Bankruptcy Code § 1121(b) grants the Debtor the exclusive right to file a Plan of

8    Reorganization during the first 120 days following the commencement of Debtor's bankruptcy

9    case. If Debtor does propound a Plan during this initial 120-day time period, Bankruptcy Code

10   § 1121(c) grants Debtor the exclusive right to solicit acceptance of its Plan during the first 180

11   days following the commencement of Debtor's bankruptcy case.    However, pursuant to

12   Bankruptcy Code § 1121(d)(1), after notice and a hearing, the Bankruptcy Court may reduce or

13   increase the 120-day and 180-day periods for cause. Pursuant to this Motion, Myron hereby

14   requests that the Court enter an Order granting a limited reduction of the 120-day and 180-day

15   exclusivity periods, such that Myron will be authorized by the Court to file a Plan and

16   Disclosure Statement notwithstanding the non-expiration of the Debtor's exclusivity periods.

17   Bankruptcy Code § 1121(b), (c) and (d) provide, in relevant part, that:

18   (b)  Except as otherwise provided in this section, only the debtor may file a

19   plan until 120 days after the date of the order for relief under this chapter.

20   (c)  Any party in interest, including…a creditor, [or] an equity security

21   holder…may file a plan if and only if-

22            ***

23   (2)  the debtor has not filed a plan before 120 days after the date of

24   the order for relief under this chapter; or

25   (3)  the debtor has not filed a plan that has been accepted, before

26   180 days after the date of the order for relief under this chapter, by each

27   class or claims or interests that is impaired under the plan

28   (d)(1)  Subject to paragraph (2), on request of a party in interest made

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949.851.7450

- 11 -

Ringstad & Sanders
LLP
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

within the respective periods specified in subsections (b) and (c) of this section and after notice an a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

Courts often terminate a debtor's exclusivity periods in order to democratize the reorganization process, and such termination of exclusivity is particularly common where, as here, there exists an acrimonious relationship between the debtor's principals. *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 160 (Bankr. D. Maine 1982)(Holding that Bankruptcy Code § 1121(c) and (d) are "intended to provide the court with flexibility in individual cases, and to democratize the reorganization process," and shortening debtor's exclusivity periods where the principal parties acrimonious relationship was an obstacle to a successful reorganization.) [Internal citation omitted]. *In re Texas Extrusion Corp.*, 68 B.R. 712 (Dist. N.D. TX 1986)(Affirming reduction of debtor's exclusivity periods where major obstacle to successful reorganization was acrimonious relationship of principal parties.).

Good cause exists for the Court to order the limited termination of the Debtor's periods of Plan exclusivity in the instant case, so as to permit Myron to file a Plan, and to extent the March 16, 2009, deadline for the filing of a Plan and Disclosure Statement. The substantial grounds for terminating the exclusivity period in this case include: (1) Because of the dishonesty, mismanagement, improper conduct, self-dealing and ineptitude described in detail in the Declaration of Myron, attached hereto, parties in interest, such as Myron, have absolutely no confidence in the Debtor's current management, or the ability of Debtor's current management to formulate and propound a confirmable Plan on a timely basis; (2) Myron is in the best position to propound a confirmable Plan, and to pay interest to Vineyard Bank pending Plan confirmation; (3) were it not for the fact that Myron is being improperly excluded from Debtor's management, Myron would be able to formulate and file a Plan on the Debtor's behalf; (4) Myron is willing to commit $1.4 million of his own funds in order to obtain Development entitlements on the Property; (5) based on the malfeasance of Debtor's current management, an acrimonious relationship currently exists between Myron (one of the estate's

1  largest creditors) and Debtor's current management; and (6) granting the limited termination of

2  the Debtor's exclusivity periods will democratize the reorganization process by permitting

3  Myron, who is one of the estate's largest stakeholders, to propound and confirm a Plan that will

4  be to the ultimate benefit of all parties in interest.

5  <center>**III.**</center>

6  <center>**GOOD CAUSE EXISTS FOR THE COURT TO GRANT THE LIMITED**</center>

7  <center>**TERMINATION OF THE DEBTOR'S EXCLUSIVITY PERIODS, AND TO EXTEND**</center>

8  <center>**THE PLAN AND DISCLOSURE STATEMENT FILING DEADLINE.**</center>

9  As was discussed above, the parties presently in control of the Debtor and its

10  bankruptcy case have engaged in a long history of self-dealing, malfeasance, mismanagement

11  and waste of the Debtor's assets.  In light of this, parties in interest, such as Myron, can have

12  absolutely no confidence in the Debtor's current management, or the ability of Debtor's current

13  management to formulate and propound a confirmable Plan on a timely basis.  Moreover, the

14  long history of self-dealing and mismanagement of the Debtor and its assets by Robertson, and

15  the fact that Myron is being improperly excluded by Robertson from participation in the

16  Debtor's management, has created an acrimonious relationship between these parties.  Under

17  the case law authority discussed above, the existence of such an acrimonious relationship

18  between the Debtor's principals constitutes cause for the termination of the Debtor's exclusivity

19  periods.

20  Further, it now appears certain that Debtor's current management cannot and/or will not

21  timely propound a Plan and Disclosure Statement by the Court's March 16, 2009, deadline.

22  The reason for this is that on March 5, 2009, Debtor filed an Ex Parte Motion for an Order

23  Continuing the Plan and Disclosure Statement Filing Deadline.  Thus, the unwillingness and/or

24  inability of Debtor's current management to timely file a Plan is jeopardizing Debtor's

25  reorganization and Myron's considerable interests in the Debtor and its Property.  Myron, as

26  well as other secured and unsecured creditors, should not be prejudiced by Debtor's

27  unwillingness and/or inability to timely propound a Plan.  Instead, the Court should find that

28  ample cause exists for granting the limited termination of the Debtor's exclusivity periods in

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949.851.7450

1    order to permit Myron to file a Plan.

2        Moreover, as set forth in detail in the Declaration of Myron, attached, were it not for the

3    fact that Myron is being improperly excluded from Debtor's management, Myron would be the

4    party that would be filing a Plan on the Debtor's behalf.  When the Debtor defaulted on its

5    obligations to Vineyard Bank, Myron automatically became a co-manager of the Debtor, with

6    the right to make final decisions for the Debtor in the event of any disagreement.  See

7    Declaration of Myron at ¶ 15.  Instead of honoring his obligations to allow Myron to control the

8    Debtor, Robertson has improperly excluded Myron from having any management authority and

9    engaged in a course of conduct contrary to the written instructions of Myron and all of its other

10   members (other than Renaissance).  See Declaration of Myron at ¶¶ 35-36, 42-43.

11       Myron has already made substantial progress toward a legitimate plan of reorganization

12   that will provide the financing and development commitments necessary to achieve a

13   confirmable Plan and a successful reorganization.  Myron is willing to commit his personal

14   funds to the cost of achieving a successful reorganization.  See Declaration of Myron at ¶¶ 63-

15   65.

16       The Plan that will be propounded by Myron will provide for the refinancing and

17   redevelopment of the Property, and will provide for monthly interest payments to be made to

18   Vineyard Bank until its encumbrance on the Property is satisfied in full.

19       Myron has already assembled an accomplished development team, consisting of a

20   developer, architects, engineers and financiers who have collectively been responsible for the

21   successful entitlement and development of numerous high-rise buildings in downtown Los

22   Angeles.  This development team has already begun the process of obtaining the necessary

23   approvals to for the redevelopment of the Property.  Myron's proposed redevelopment plan for

24   the property includes 210 to 236 apartments with mixed retail space.  This development plan is

25   consistent with the requirements of the United States Department of Housing and Urban

26   Development ("HUD"), which will fund the construction on the Debtor's Property.  Myron has

27   already submitted an application to HUD, and has paid from his personal funds a $40,000 fee

28   associated with obtaining HUD funding.  Myron is further willing to commit his personal funds,

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949.851.7450

1   up to $1.4 million, toward the cost of obtaining the needed development entitlements on the

2   Property. See Declaration of Myron at ¶¶ 63-64. See Declaration of Hales at ¶¶ 5-7.

3       Obtaining development entitlements will greatly increase the value of the Property to

4   the benefit of all secured and unsecured creditors and will permit the Property to be refinanced.

5   Under Myron's Plan, Debtor will obtain financing of approximately $54 million from HUD.

6   These funds will not only be used to fund construction, but will also be used to satisfy the first

7   priority encumbrance of Vineyard Bank, as well as to make payments under the Plan to

8   unsecured creditors. See Declaration of Hales at ¶¶ 5-7.

9       Further, under Myron's Plan, Vineyard bank will receive monthly interest payments at

10  the non-default contractual rate until such time as all principal owed to Vineyard Bank is repaid

11  through the refinancing of the Property.  Myron is presently arranging a fund of approximately

12  $2 million to cover, among other things, continuing interest payments to Vineyard Bank until

13  its encumbrance can be satisfied. See Declaration of Myron at ¶ 65. See Declaration of Hales at

14  ¶¶ 5-7.

15                                      **IV.**

16                                  **CONCLUSION**

17      Debtor's current management has exhibited a long history of self-dealing and

18  mismanagement of the Debtor and its Property, and an acrimonious relationship currently exists

19  between Myron and Debtor's management.  Debtor's current management has shown an

20  inability and/or unwillingness to timely file a Plan and Disclosure Statement, jeopardizing the

21  interests of all interested parties, including Myron.

22      Were it not for Myron being improperly excluded from the Debtor's management,

23  Myron would have the ability to propound a Plan for the Debtor.  Myron has already made

24  considerable progress in the development of his own reorganization plan, and is willing to

25  commit his personal funds toward making Debtor's reorganization successful.

26  ///

27  ///

28      Myron submits that each of the foregoing facts constitute good and sufficient cause for

Ringstad & Sanders
LLP
2030 Main Street, 12th Floor
Irvine, California 92614
949/851.7450

1   the Court to grant the limited termination of the Debtor's exclusivity periods so as to permit

2   Myron to file and Plan and Disclosure Statement, and Myron further respectfully requests that

3   the Court continue the March 16, 2009 Plan and Disclosure Statement filing deadline for a

4   period of 60 days in order to permit Myron to file a Plan.

5                                              Respectfully submitted,

6   DATED: March __10__, 2009                  RINGSTAD & SANDERS LLP

7

8                                              By: _____

9                                              Todd C. Ringstad
                                               Christopher A. Minier
10                                             Counsel for James Myron, individually and
                                               as trustee of the James Myron Trust dated
11                                             April 12, 2001

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 16 -

**DECLARATION OF JAMES MYRON**

I, James Myron, hereby declare:

1.      The following matters are true and correct and within my own personal knowledge. If called as a witness, I could and would competently testify hereto.

2.      I am the trustee and the sole beneficiary of the James Myron Trust dated April 12, 2001. Hereafter the James Myron Trust dated April 12, 2001, and I shall collectively be referred to herein in the first person, i.e., "I," "me," "my," Etc. I am the sole Class "B" member of The Olympic on Grand, LLC (hereafter "OOG" or "Debtor"), a California limited liability corporation and the debtor and debtor-in-possession herein, and I thereby own a 20% interest in the Debtor. I am also one of the Debtor's secured creditors.

3.      Debtor currently holds title to certain real property located at 1020 - 1024 South Grand Avenue, Los Angeles, California (hereafter the "Property"). Since 1946, and until it was transferred to the Debtor, my family owned the Property. The Property consists of approximately 58,300 square feet of land improved with one or more structures comprising a nightclub and parking lot. My mother, Myrna Myron, was a former chorus girl and she originally purchased the Property to operate a nightclub for dancers and bands in the Big Band Era. The nightclub survived the end of the Big Band Era and has reinvented itself as a concert venue and nightclub for more than sixty years.

4.      In 2005, I held title to the Property and listed it for sale. During the last quarter of 2005, I was approached by Richardson Robertson III and Mark Abrams, who represented themselves as developers and expressed an interest in purchasing the Property in order to redevelop it into two luxury, mixed-use, high-rise condominium towers over retail space. The total cost of construction of the development project was estimated to be $240,000,000 to $350,000,000.

5.      Richardson Robertson III is an architect licensed by the California Architects Board, and holds license # 25841. Richardson Robertson III is the owner and/or an officer of entities known as Richardson Robertson & Associates, Inc. ("RRA"), and Beaux Arts, LLC ("Beaux Arts"). Richardson Robertson III and RRA were to be the architect / designer of the

Ringstad & Sanders
LLP
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

1  proposed redevelopment project. Hereafter Richardson Robertson III, RRA and Beaux Arts shall

2  be collectively referred to as "Robertson."

3      6.    Mark Abrams and Robertson initially sought to purchase the Property from me

4  through an offer made from Rodmark Partners, Inc., a California corporation. Rodmark, Inc., a

5  California corporation, is the successor-in-interest to Rodmark Partners, Inc. (Hereafter Rodmark

6  Partners, Inc., and Rodmark, Inc., shall be collectively referred to as "RPI"). At all relevant

7  times, Mark Abrams was an owner and/or officer of RPI. In or about October of 2005, after I had

8  rejected RPI's initial offer to purchase the Property, Mark Abrams approached me with an

9  alternative proposal: that I would sell the Property to RPI at an increased price of $30 million,

10  that I would loan RPI a portion of the money towards the total purchase price ($17,500,000)

11  pursuant to a promissory note and deed of trust subordinated to a senior encumbrance securing a

12  loan to be obtained from a bank, and that I would receive an ownership and profit participation

13  interest in the development project.

14      7.    To induce me to sell the Property pursuant to the above-described terms,

15  Robertson and Mark Abrams represented to me that I would have authority to approve project

16  budgets and to remove the manager of the project for cause (E.g., fraud, gross negligence or

17  willful misconduct). In addition, to further induce me to sell the Property pursuant to the above-

18  described terms, Robertson and Mark Abrams represented themselves to me as competent

19  financiers, architects, and developers, qualified to attract investors and lenders, entitle the

20  development project and to financially manage the project. Based upon these representations, I

21  agreed to sell the Property to RPI.

22      8.    On or about November 9, 2005, I entered into a written Purchase and Sale

23  Agreement with RPI (hereafter the "Sale Agreement"), a copy of which is attached as Exhibit

24  "1." Paragraph 2 of the Sale Agreement specifies that the purchase price of the Property was $30

25  million. Further, pursuant to paragraph 3.C., of the Sale Agreement, I agreed to "lend to Buyer

26  the sum of $17,500,000 to be applied by Buyer toward the purchase price (hereafter the

27  'Subordinated Purchase Money Loan')."

28

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

9.     On or about January 19, 2006, RPI and I entered into the First Amendment to Purchase and Sale Agreement (hereafter the "1st Amendment"), a copy of which is attached as Exhibit "2." The 1st Amendment provided for, among other things, a modification of the interest rate for the Subordinated Purchase Money Loan.

10.     On or about October 25, 2006, RPI and I entered into the Second Amendment to Purchase and Sale Agreement (hereafter the "2nd Amendment"), a copy of which is attached hereto as Exhibit "3". Under Paragraph 3 of the 2nd Amendment, RPI and I acknowledged and agreed that "[a]ffiliates of both Buyer and Seller have formed The Olympic on Grand, LLC [the Debtor herein], a California limited liability company (the 'Company') to own and develop the Property as originally contemplated in Paragraph 17 of the Purchase Agreement. Accordingly, at Closing, Seller shall transfer title to the Property, in the manner as more fully set forth in the Purchase Agreement, to the Company."

11.     Debtor was formed on or about November 19, 2005. In connection with the closing of the Sale Agreement, Debtor took title in the Property. The Renaissance on Grand, LLC, a California limited liability company ("Renaissance"), is the present managing member of the Debtor. In turn, The Titan Organization, Inc., a California corporation ("Titan"), is the sole owner and managing member of Renaissance. Robertson is currently Titan's majority shareholder, and he recently installed himself as Titan's President, sole, Director, Chief Financial Officer and Secretary.

12.     Debtor is governed by an Amended and Restated Operating Agreement (hereafter the "*Operating Agreement*"), a copy of which is attached as Exhibit "4." The Operating Agreement provides that Debtor's principal purposes include the acquisition of the Property, its development into "two multi-unit residential luxury condominium buildings with restaurants, indoor pool, health club, spa and other amenities ('Project')."

13.     Under Paragraph 9.1(g) of OOG's Operating Agreement, I (as the Class B member of OOG) was to have "[a]pproval of the initial operating budget for each financing stage of the Project (each, an 'Operating Budget'). In connection therewith, upon delivery by the Manager of

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949.851.7450

1    an Operating Budget to the Class B Member, the Class B Member shall have ten (10) days to

2    approve or disapprove of such Operating Budget."

3           14.    There are three separate classes of ownership interests in the Debtor. I am the sole

4    Class "B" member of the Debtor, owning a 20% interest in the Debtor. Renaissance is the

5    managing member and sole Class "A" member of the Debtor, owning a 57.5% interest in the

6    Debtor. Renaissance is an entity that is wholly owned by Titan. Titan is the managing member

7    of Renaissance. Robertson is currently in control of Titan. There are also three Class "C"

8    members of the Debtor who collectively own a 22.5% interest the Debtor.

9           15.    Under Paragraph 5 of the 2nd Amendment, I agreed to further subordinate the

10    Subordinated Purchase Money Loan in favor of the primary mortgage and an additional GAP

11    Loan "to secure funds necessary for the continued development of the Property and Project until

12    such time as the necessary entitlements and approvals have been obtained and the Company can

13    secure the Mezzanine Financing and the Construction Loan." [Exhibit "3"]. That agreement

14    further specifically provides that I am to be a co-manager of OOG. Paragraph 10(a) of the 2nd

15    Amendment, states:

16               In order to allow the Trust [i.e., Myron] to protect its

17         interest in the Myron GAP Loan and the Subordinated Purchase

18         Money Loan, in the event of a Senior Loan Default, as hereinafter

19         defined, and for so long as the Senior Loan Default is continuing,

20         the Trust [i.e., Myron] also shall automatically, without the

21         requirement of further action by the Company, become a co-

22         manager of the Company along with Renaissance on Grand, LLC

23         ('Renaissance'). Both the Trust and Renaissance shall have an

24         equal vote on all matters; provided, however, that in the event of a

25         disagreement between the Trust and Renaissance, the final

26         decision of the Trust shall be binding upon the Company. At such

27         time as the Company timely cures the Senior Loan Default, the

28         Trust will cease being a manager. The parties hereto hereby agree

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949.851.7450

1    to amend the Operating Agreement to reflect the foregoing

2    provisions. For purposes of this paragraph, a 'Senior Loan

3    Default' shall mean an event of default declared by one of the

4    senior lenders under the applicable loan documents that goes

5    uncured by the Company for more than thirty (30) days beyond

6    any applicable cure period as set forth in the applicable loan

7    documents. [Underline added]. [Exhibit "3"].

8        16.    Under Paragraph 12 of the 2nd Amendment, the parties agreed that, upon closing of

9    the Sale Agreement, an entity known as 1024 Grand, LLC ("*1024*") would "take over all day-to-

10   day management of the Club," and I would no longer have any responsibilities with respect to the

11   nightclub located at the Property or the Property itself. [Exhibit "3"]. Debtor is and was, at all

12   relevant times, the owner of 1024, and Titan is and was, at all relevant times, the managing

13   member of 1024.

14       17.    In connection with the Sale Agreement, Debtor obtained a loan with Preferred

15   Bank as its primary mortgage for the Property, in the amount of $12,800,000. The Preferred

16   Bank loan was subsequently replaced, in May 2007, by a loan in the amount of $18,000,000 by

17   Vineyard Bank, N.A. (hereafter "Vineyard Bank"), as the primary mortgage for the Property, and

18   secured by a First Deed of Trust recorded against the Property.

19       18.    Under Paragraph 7 of the 2nd Amendment, I agreed to loan the Debtor an

20   additional $1,500,000 as a Myron GAP Loan at the interest rate of twelve percent (12%). The

21   Myron Gap Loan was memorialized in a Promissory Note Secured by Subordinated Deed of

22   Trust dated October 25, 2006, (hereafter the "*Myron Gap Note*)," a copy of which is attached as

23   Exhibit "5." This loan from me to the Debtor was actually made as a "pass through" loan to an

24   entity known as Loma Vista Financial, LLC ("LVF"). Peggy Abrams, the wife of Mark Abrams,

25   is the sole member and managing member of LVF. The maximum principal amount of the LVF

26   loan is presently allowed up to $3,000,000, and is secured by a Second Deed of Trust recorded

27   against the Property.

28

19.    Therefore, in summary, the encumbrances against the Property are:

1st TD    Vineyard Bank    $18,000,000

2nd TD    LVF    $ 3,000,000  (up to $3 million)

3rd TD    Myron    $17,500,000

20.    On October 25, 2006, RPI, the then managing member of Renaissance, the present managing member of Debtor, executed a Promissory Note in favor of me (hereafter the "Subordinate Note," a copy of which is attached as Exhibit "6.") secured by subordinated Third Deed of Trust against the Property, also in favor of me.

21.    As part of his obligations under the Purchase Agreement, 1st Amendment and 2nd Amendment (referred to hereinafter collectively as the "Purchase Agreement"), and in reliance on the representations of Robertson, Abrams, Renaissance and Titan, I entered into a written Subordination Agreement with Vineyard on May 30, 2007 (hereafter the "Subordination Agreement").

22.    On October 24, 2006, Myron's Ballroom and Myron's Enterprises (both of which are owned by me and/or my family members) entered into a written agreement with Debtor's wholly owned and controlled 1024 entity regarding the nightclub located on the Property (hereafter the "Nightclub Agreement"), a copy of which is attached as Exhibit "7"). Under Paragraph 1 of the Nightclub Agreement, Myron's Ballroom and Myron's Enterprises agreed to grant 1024 "sole control over aspects of the operations and ownership of the Nightclub, including without limitation the economic, business, creative, employment, security, and parking matters..."

23.    Before the close of the Purchase Agreement, and for over a year afterward, Robertson,  Renaissance and Titan failed to disclose to me that Debtor had entered into contracts with Robertson's company, RRA, providing for Debtor to pay Robertson and/or RRA extravagant levels of compensation and reimbursement of expenses.  Specifically, on March 15, 2006, Debtor entered into an Architectural Agreement with RRA (hereafter the "AIA Agreement," a copy of which is attached as Exhibit "8").

Ringstad & Sanders
LLP
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

24.    Under section 1.5.1 of the AIA Agreement, RRA's compensation consists of "4.25% of the Cost of Construction plus a bonus of 4.25% of the cost of construction upon profit distribution to the Olympic on Grand, LLC [Debtor]." As part of RRA's compensation, section 1.5.7 of the AIA Agreement provides that Debtor shall make an initial payment of $1,465,600 upon the execution of the AIA Agreement. Subsequent payments for services shall be made monthly in proportion to services performed on the basis set forth in the AIA Agreement.

25.    The AIA Agreement provides an unprecedented and ludicrous level of compensation to Robertson and RRA that is not commensurate with the scale of the development project, the value of contemplated services or reasonable expectations in the architecture industry.

26.    Further, on March 28, 2006, Debtor entered into a Residential Interior Design Services Agreement with RRA (hereafter the "ASID Agreement," a copy of which is attached as Exhibit "9"), for RRA to design the interior of the project's "common areas including, but not limited to, spa, business center, theater…and any other areas deemed necessary by Rodmark, Inc. Two mixed-use buildings (residential and retail)…with approximate 11,600 square feet including sales offices and complete interior design."

27.    Under paragraph 4 of the ASID Agreement, RRA's compensation is described as a fixed fee of $3,000,000 to be paid as follows: (a) presentation of design boards: $420,000; (b) $69,000 per month starting July 11, 2006, to June 11, 2007; and (c) $90,000 per month commencing July 11, 2007 until completion or $2,170,800, whichever is earlier. The ASID Agreement also provides an unprecedented and inflated level of compensation to Robertson that is not commensurate with the scale of the project, the value of contemplated services or reasonable expectations in the interior design industry.

28.    Despite the fact that Robertson has produced no approved conceptual design or plans for the Property, and the fact that payments contemplated by AIA Agreement and ASID Agreement were never approved by me as part of the Project's operating budget as required under Paragraph 9.1(g) of Debtor's Operating Agreement, Robertson / RRA received over $3 million in payments from Debtor. Moreover, the plans produced by Robertson / RRA to date require such

Ringstad & Sanders
LLP
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

1    an exorbitant cost of construction that they are commercially unfeasible, as no one would ever

2    finance such extravagant construction.

3           29.    In addition, on June 5, 2006, Robertson obtained a Board Consent authorizing

4    Titan's opening of a bank account with Wells Fargo Bank and naming Robertson a signatory

5    (hereafter the "Board Consent," a copy of which is attached as Exhibit "10").  Titan deposited

6    funds of the Debtor into this account.  Robertson was neither an officer nor director of Titan at

7    any time relevant to this event, and there was no apparent justification for Robertson obtaining

8    such broad authority to access the funds of Titan and the Debtor.  I subsequently learned that

9    Robertson used his signatory authority to receive hundreds of thousands of dollars in

10    unsubstantiated payments from Debtor's and Titan's coffers, including Robertson's

11    misappropriation of $150,000 in parking revenue paid to Debtor.  Attached as Exhibit "11" is a

12    copy of the $150,000 check whereby Robertson misappropriated parking revenue paid to Debtor.

13    The foregoing acts of Robertson resulted in Robertson enriching himself in the amount of at least

14    $3.15 million at the Debtor's expense.

15           30.    I also subsequently discovered that Robertson's entity, BA, also entered into an

16    undisclosed Participation Agreement dated January 2, 2007, with Titan's controlling shareholder,

17    pursuant to which BA acquired the right to participate in 88% of any cash distributions from

18    Titan to its then controlling shareholder in connection with distributions from Debtor regarding

19    the development project.  Furthermore, the Participation Agreement effectively gave Robertson

20    (through BA) a conversion right pursuant to which he could elect to obtain a controlling interest

21    (88%) in Titan.  Upon exercise of the conversion right, which subsequently occurred, Robertson

22    gained control of Titan, which, in turn, controlled Renaissance which, in turn, controlled Debtor.

23    I was unaware of the Participation Agreement until November 2008.

24           31.    On November 3, 2008, Robertson and/or BA exercised their conversion right

25    under the Participation Agreement with Titan, conducted a Titan shareholder meeting, and voted

26    to remove Gary Warfel, then Titan's President, Secretary, Chief Financial Officer, Treasurer and

27    Director, and installed Robertson as Titan's new President, sole Director, Chief Financial Officer

28    and Secretary.

Ringstad & Sanders
L.L.P.
2030 Main Street, 12ᵗʰ Floor
Irvine, California 92614
949 851 7450

32.    Following the maturity date of its loan with Vineyard Bank, Debtor was unable to repay or refinance this first priority loan.  On July 2, 2008, Vineyard Bank filed a foreclosure action against Debtor in Los Angeles County Superior Court (*Vineyard Bank, N.A. v. The Olympic on Grand, LLC, et al.*, Case No. BC393730).  Subsequently, on July 9, 2008, LandAmerica Default Services, as trustee under the deed of trust securing the Vineyard Bank loan, recorded a Notice of Default.

33.    On November 17, 2008, Vineyard Bank recorded a Notice of Trustee's Sale (a copy of which is attached as Exhibit "12"), to auction the Property in a foreclosure sale.  Robertson is aware that Debtor's primary mortgage on the Property is in default, and subject to a foreclosure sale most recently scheduled for January 13, 2009.  In addition, in Vineyard Bank's foreclosure action against the Debtor, on July 16, 2008, the Los Angeles County Superior Court entered an order appointing Robb Evans & Associates, LLC (hereafter the "Receiver"), as receiver of the Debtor's real Property.  Since his appointment, the Receiver has at all times been in possession and control of the Property.

34.    On or about August 8, 2008, following Debtor's uncured Senior Loan Default, I automatically became Debtor's co-manager, as provided in the Purchase Agreement quoted above.  Until Robertson's removal of Warfel, Titan recognized my position as Debtor's co-manager.  Moreover, in the Indemnity Agreement discussed in detail below and attached hereto as Exhibit "13," Robertson had previously acknowledged my right, under the 2nd Amendment, to become Debtor's co-manager in the event of such a default.

35.    In an effort to financially reorganize the Debtor and the project, I proposed, and all of Debtor's members, save for Renaissance (which was recently hijacked by Robertson), voted to file a petition for reorganization under Chapter 11 of the United States Bankruptcy Code under my authority as co-managing member.  Attached hereto as Exhibit "14" is a copy of the Unanimous Written Consent of all of Debtor's members other than Renaissance for the commencement of a Chapter 11 bankruptcy case by the Debtor under my authority as co-manager.  On behalf of Titan, Robertson refused to cooperate with the request of all of Debtor's co-members.

- 25 -

36.     Instead, acting alone and without soliciting the consent of Debtor's co-members, Robertson caused Debtor, a California limited liability company, to improperly file an *in propria personam* Chapter 11 petition on December 9, 2008. It was Robertson who was the sole person to sign Debtor's bankruptcy petition. This bankruptcy case commenced by Robertson for the Debtor was commonly known as *In re The Olympic on Grand, LLC,* U.S.B.C. Case No. 2:08-31345 ER (hereafter Debtor's "First Bankruptcy Case"). In connection with Debtor's First Bankruptcy Case, Robertson also caused Debtor to initiate an adversary proceeding against receiver Robb Evans seeking turnover of Debtor's Property. This adversary action is commonly known as *The Olympic on Grand, LLC v. Robb Evans & Assoc., LLC,* U.S.B.C. Adv. Proc. No. 2:08-01999 ER (hereafter the "Adversary Proceeding").

37.     In light of Debtor's improper filing of its First Bankruptcy Case caused by Robertson, on December 15, 2008, the United States Trustee filed a motion to dismiss Debtor's First Bankruptcy Case for cause.

38.     Although the manner in which Robertson commenced Debtor's First Bankruptcy Case may have been technically improper, continuation of the case was in the best interests of all interested parties. The reason for this is that Vineyard Bank's foreclosure sale of the Debtor's real Property was scheduled for January 13, 2009. If the Debtor's First Bankruptcy Case were to be dismissed, Debtor would lose the protection of the automatic stay, and would likely lose its sole asset, i.e., the Property, to foreclosure.

39.     Subsequently, on January 12, 2009, the day before Vineyard Bank's scheduled foreclosure sale of the Property, Robertson (this time with the aid of counsel) caused the Debtor to commence the instant Chapter 11 case.

40.     On January 22, 2009, Vineyard Bank filed two motions. In one of its motions, Vineyard bank seeks relief from the automatic stay so as to permit the continued administration of the receivership estate. It should be noted that in its stay relief motion, Vineyard Bank does not seek relief from the automatic stay to permit it to conclude a trustee's foreclosure sale of the Property. Vineyard Bank's second motion sought an order excusing the receiver from complying with his obligations to turnover bankruptcy estate property under 11 U.S.C. § 543(a)-(c).

- 26 -

41.    On February 10, 2009, hearings were held on Vineyard Bank's foregoing motions. In connection with these hearings, the Court issued a written tentative ruling, a copy of which is attached hereto as Exhibit "19."

42.    On December 8, 2008, in clear violation of my rights under the 2nd Amendment, quoted above, Robertson sent a letter to my counsel asserting that "Renaiassance on Grand LLC is the Sole Manager of The Olympic on Grand, LLC [Debtor]. . . . We will not agree that Mr. Myron or his Trust, which owns 20% of The Olympic on Grand, LLC, be the co-manager of the Olympic on Grand. . . . As the Manager of The Olympic on Grand, LLC, I have always been and will continue to be fiduciary to all of the members, investors and debtors in the project." A copy of Robertson's December 8, 2008, letter is attached as Exhibit "15."

43.    The foregoing behavior by Robertson constitutes a gross mismanagement of the Debtor's affairs, and a clear violation of my contractual right to act as co-manager of the Debtor. Moreover, this behavior of Robertson constitutes a course of conduct that goes squarely against the written instructions of every equity holder in the Debtor other than Renaissance.

44.    On June 6, 2007, Robertson, Debtor and Titan, on one hand, and I, on the other hand, entered into an Indemnity Agreement (hereafter the "*Indemnity Agreement*," a copy of which is attached as Exhibit "13"). Under the Indemnity Agreement, Debtor, Titan and Robertson acknowledged my right to "take control of the Company [i.e., Debtor] as a result of a default of either of the Deeds of Trust," as set forth in the 2nd Amendment. Among other things, Robertson as one of the "Titan Parties," agreed under the Indemnity Agreement to "not allow any lien to attach to the Property, . . . for any architectural fees, engineering fees, legal fees, or development fees or any other fees or expenses owed to any of the Titan Parties (collectively, 'Titan Fees'), which may be owed to them now or in the future."

45.    Despite having executed the Indemnity Agreement, and in blatant violation of its terms, on October 30, 2008, Robertson recorded a mechanic's lien in the amount of $4,929,800.59 against the Property in the Office of the Recorder for the County of Los Angeles (hereafter the "Mechanic's Lien," a copy of which is attached as Exhibit "17"). Robertson's Mechanic's Lien is invalid as it does not reflect the reasonable value of any labor, services,

Ringstad & Sanders
L.L.P
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

1    equipment or material furnished by Robertson or any unpaid remaining amounts for a price

2    agreed upon in the AIA Agreement or ASID Agreement.

3        46.    Robertson has already received payments far in excess of the value of his services

4    rendered under the contracts.  In addition, no work of improvement has commenced on the

5    Property, nor has any building permit or other governmental approval or entitlement been

6    obtained for the project.  Further, Robertson failed to submit any claim for nonpayment of

7    services, as required under the AIA Agreement, prior any time limit to record its Mechanic's

8    Lien.

9        47.    I have been negotiating with lenders willing to provide the substantial new

10   financing required to prevent the imminent foreclosure by Vinyard Bank; provided that the

11   project complies with certain strict conditions.  One condition is that the project not be subject to

12   any encumbrances senior in priority to the lien which will secure such new financing.  I believe

13   that Robertson intentionally recorded this invalid mechanic's lien to derail my ability to obtain

14   financing necessary to redeem Debtor's primary mortgage with Vineyard Bank on the Property,

15   in an effort to derail my from rescuing the Property from imminent foreclosure.

16       48.    Despite the request of Debtor and I, Robertson refused to release his invalid

17   Mechanic's Lien.  Consequently, on November 10, 2008, Debtor and I filed a lawsuit against

18   Robertson in the Los Angeles County Superior Court (*The Olympic On Grand, LLC, et al.. v.

19   Richardson Robertson & Associates, Inc., et al.*, Case No. BC401674), seeking immediate release

20   of the Mechanic's Lien.  On the night before the November 24, 2008, hearing on the plaintiffs'

21   motion for preliminary injunction to have the Mechanic's Lien released, Robertson finally

22   relented and released the Mechanic's Lien.

23       49.    The foregoing constitutes a clear and intentional breach of Robertson's contractual

24   duties to the Debtor, and gross mismanagement of the Debtor's affairs.

25       50.    From the closing of the Purchase Agreement through June 6, 2007, I made

26   repeated requests to the parties controlling Debtor for operating budgets, as required under

27   Debtor's Operating Agreement.  Such parties consistently refused to provide me with copies of

28   any budgets, which I could then approve or disapprove as the Class B member of Debtor.

Ringstad & Sanders
LLP
2030 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

- 28 -

51    On June 6, 2007, Titan, on behalf of the managing member of the Debtor, executed a written Commitment to Prepare Operating Budget (hereafter the "*Commitment*," a copy of which is attached as Exhibit "16").

52.    It was not until nearly one-year later, in May of 2007, that I was provided with an operating budget.  By that time, and before I could approve or disapprove the budget, Robertson, Abrams, Renaissance and Titan had already spent all of the project funds, consisting of millions of dollars.

53.    Renaissance, Titan, Robertson and/or Abrams have mismanaged Debtor's assets and contractual relationships in a variety of other ways as well, resulting in the incurrence of potential liability for Debtor, 1024, myself and others, and the need for Debtor and I to defend against multiple claims, demands and lawsuits from third parties.  Under current management, in only the past approximately eighteen months, a total of four different lawsuits have been commenced against the Debtor in Los Angeles County Superior Court.  These lawsuits allege claims including breach of written promissory note, breach of contract (promotional agreement), and breach of two different parking lot leases.  A fifth lawsuit for wrongful death occurring on the Property has also been brought against Abrams, Titan and I.  Plaintiffs in this wrongful death lawsuit allege that defendants and others failed to obey laws regulating the sale of alcohol at the nightclub on the Property and failed to take steps to prevent Joseph Cosina from being killed on January 4, 2008, in the parking lot of the Property.

54.    In addition to the litigation to date, the parties that have been managing the Debtor have recklessly created potential liability by entering into a parking lease agreement for the Property with Allstate, when an existing parking lease agreement was already in place with Unified Parking Service, Inc. (hereafter "Unified").

55.    The parties managing the Debtor have also mismanaged its affairs by failing to collect any revenue from any of the nightclub owners that used the Property.  For well over a year, the parties managing the Debtor did not collect or ensure that any taxes for alcohol sold by the nightclub after the close of the Purchase Agreement were sent to the State of California.  In short, the parties managing the Debtor have done nothing to protect the project's or my interests

Ringstad & Sanders
L.L.P.
2010 Main Street, 12th Floor
Irvine, California 92614
949 851 7450

1    in the Property exposing us each to tax liability.

2        56.    The parties that have been in charge of the Debtor have also failed to properly file

3    timely income taxes or provide K-1's forms to Debtor's members, including me, preventing such

4    members from timely completing their own tax returns and exposing them to potential tax

5    liability.

6        57.    Lastly, before the close of the Purchase Agreement, and for over a year afterward,

7    Robertson and Titan failed to tell me about the nature of their relationships with Abrams, or about

8    Abrams' criminal history.

9        58.    Abrams is a "Consultant" to Titan, and was and is provided office space, telephone

10    service and e-mail from Titan. Abrams was also an undisclosed owner of RPI, the initial buyer of

11    the Property, at the time the parties entered into and closed the Purchase Agreement.

12        59.    On January 20, 2006, the United States filed a federal information against Abrams

13    for conspiracy, bank fraud, false statement on tax return and obstruction of justice, to which

14    Abrams has pled guilty (*United States v. Abrams*, United States District Court, Central District of

15    California Case No. 06-CR-00044 DDP). A copy of the *United States v. Abrams* Docket is

16    attached as Exhibit "18."

17        60.    In addition, before the close of the Purchase Agreement, and for over a year

18    afterward, Abrams, RPI, Titan and Robertson failed to disclose to me that, since September 1,

19    2006, Titan had been paying Abrams $50,000 per month and all of Abrams' expenses (including

20    car, healthcare, travel, cellular telephone and credit cards) from the project's loan proceeds. Such

21    sums were allegedly paid to Abrams pursuant to an "Independent Contractor Agreement" that

22    was executed by Titan and Abrams on September 20, 2007, but made retroactive to September 1,

23    2006. Attached as Exhibit "20" is a copy of the Independent Contractor Agreement between

24    Titan and Abrams. Again, this is egregious conduct in that Abrams was paid these excessive

25    sums despite the fact that they were never approved by me as part of the Project's operating

26    budget as required under Paragraph 9.1(g) of Debtor's Operating Agreement.

27        61.    As was discussed above, the parties presently in control of the Debtor and its

28    bankruptcy case have engaged in a long history of self-dealing, malfeasance, and the

Ringstad & Sanders
L.L.P.
2030 Main Street, 12ᵗʰ Floor
Irvine, California 92614
949 851 7450

1  mismanagement and waste of the Debtor's assets.  In light of this, I have absolutely no

2  confidence in the Debtor's current management, or the ability of Debtor's current management

3  to formulate and propound a confirmable Plan on a timely basis.  Moreover, the long history of

4  self-dealing and mismanagement of the Debtor and its assets by Robertson, and the fact that I

5  am being improperly excluded by Robertson from participation in the Debtor's management,

6  has created a very acrimonious relationship between Robertson and I.

7          62.    Further, it now appears certain that Debtor's current management cannot and/or

8  will not timely propound a Plan and Disclosure Statement by the Court's March 16, 2009,

9  deadline.  The reason for this is that on March 5, 2009, Debtor filed an Ex Parte Motion for an

10  Order Continuing the Plan and Disclosure Statement Filing Deadline.  Thus, the unwillingness

11  and/or inability of Debtor's current management to timely file a Plan is jeopardizing Debtor's

12  reorganization and my considerable interests in the Debtor and its Property.  I, as well as other

13  secured and unsecured creditors, should not be prejudiced by Debtor's unwillingness and/or

14  inability to timely propound a Plan.

15          63.    I have already made considerable progress in the development of his own

16  reorganization plan, and I am willing to commit my personal funds toward making Debtor's

17  reorganization successful.

18          64.    The Plan that I will propound will provide for the refinancing and redevelopment

19  of the Property, and will provide for monthly interest payments to be made to Vineyard Bank

20  until its encumbrance on the Property is satisfied in full.  I am willing to commit my personal

21  funds, up to $1.4 million, toward the cost of obtaining the needed development entitlements on

22  the Property.  Obtaining development entitlements will greatly increase the value of the

23  Property to the benefit of all secured and unsecured creditors.  In addition, obtaining

24  development entitlements will permit the Property to be refinanced.

25  ///

26  ///

27

28

Ringstad & Sanders
L.L.P.
2010 Main Street, 12th Floor
Irvine, California 92614
949 851-7450

65.   I am presently arranging a separate fund of approximately $2 million to provide for interest payments to Vineyard Bank until its encumbrance has been satisfied, and related costs. I expect to have these funds in place within 30 days.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct. Executed this *10* day of March, 2009, at *STUDIO CITY*, California. *91604*.

X _James Myron_

- 32 -

Ringstad & Sanders
LLA
1200 Main Street, 14th Floor
Costa Mesa, 92614
949.851.7450

1

## DECLARATION OF DANIEL C. HALES

2      I, Daniel C. Hales, hereby declare:

3      1.      The following matters are true and correct and within my own personal

4      knowledge. If called as a witness, I could and would competently testify hereto.

5      2.      I am an attorney licensed to practice law before all of the courts of the State of

6      California. Since approximately 1999, I have been counsel for James Myron individually and as

7      trustee of the James Myron Trust dated April 12, 2001 (hereafter collectively "Myron"). I was

8      counsel for Myron in connection with his sale of the real property to the Debtor, and I currently

9      represent Myron in his effort to assemble a development team to redevelop the property and to

10     refinance the property. In connection with the refinance of the Debtor's real property, I represent

11     Myron in his efforts to obtain a construction loan from the United States Department of housing

12     and Urban Development ("HUD").

13     3.      It was not until approximately March 5, 2009, that Myron and I learned for the

14     first time that the Debtor would not be willing and/or unable to file a Plan by the Court's March

15     16, 2009, deadline. Myron and I became aware of Debtor's failure to timely file a Plan only upon

16     March 5, 2009, when Debtor filed an Ex Parte Motion for an Order Continuing the Plan and

17     Disclosure Statement Filing Deadline. Myron and I believe that the Debtor can be successfully

18     reorganized for the benefit of all interested parties, and Myron has made considerable progress in

19     the development of his own reorganization plan that will provide for the financing and

20     development commitments necessary to redevelop the property.

21     4.      After learning that the Debtor would not be filing a Plan by the Court's March 16,

22     2009, deadline, counsel for Myron prepared the instant motion as expeditiously as possible in an

23     effort to prevent the prejudice that would result to all interested parties if the Court were to either

24     dismiss the Debtor's chapter 11 case or appoint a chapter 11 trustee upon expiration of the

25     deadline. Accordingly, Myron respectfully requests that the Court hold a hearing on this motion:

26     (1) prior to the expiration of the Court's March 16, 2009, deadline; and (2) concurrently with the

27     hearing on the Debtor's Ex Parte Motion for an Order Continuing the Plan and Disclosure

28     Statement Filing Deadline.

Ringstad & Sanders
L.L.P.
2030 Main Street, 12th Floor
Irvine, California 92614
949.851.7450

4.    Myron has already assembled a development team to redevelop the Property consisting of a developer, architects, engineers and financiers. In assembling this development team, I interviewed many developers, architects, engineers and financiers. The development team has already begun the preparation of feasibility studies for the redevelopment of the Property.   Myron's proposed redevelopment plan for the property includes 210 to 236 apartments with mixed retail space. This development plan is consistent with the requirements of the United States Department of Housing and Urban Development ("HUD"), which will fund the construction on the Debtor's Property.  Myron has already submitted an application to HUD, and has paid from his personal funds a $40,000 fee associated with Debtor obtaining HUD funding.

5.    The process of obtaining development entitlements and financing will greatly increase the value of the Property to the benefit of all secured and unsecured creditors. We expect to obtain financing of approximately $54 million from HUD, which will fund construction and satisfy the first priority encumbrance of Vineyard Bank, as well as to make payments under the Plan to unsecured creditors.

7.    Further, under Myron's Plan, Vineyard bank will receive monthly interest payments from the non-default contractual rate until such time as all principal owed to Vineyard Bank is repaid through the refinancing of the Property. Myron is presently arranging a fund of approximately $2 million to cover, among other things, continuing interest payments to Vineyard Bank until its encumbrance can be satisfied.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct. Executed this ___ day of March, 2009, at _____, California.

Daniel C. Hales

- 34 -

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("**Agreement**"), dated November 9, 2005, for reference purposes only, is entered into by and between JAMES MYRON ("**Seller**"), and RODMARK PARTNERS, INC., a California corporation, or its assignee ("**Buyer**"), with reference to the following facts:

### RECITALS:

A.    Seller is the fee simple owner of the Property, as hereinafter defined, consisting of approximately 58,300 square feet of real property improved with one or more buildings and a parking lot located at 1024 South Grand Avenue, Los Angeles, California.

B.    Buyer desires to purchase the Property from Seller and Seller is willing to sell the Property to Buyer on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledges, the parties agree as follows:

1.    **Purchase and Sale.**

Seller agrees to sell the Property to Buyer and Buyer agrees to purchase the Property from Seller, all on the terms, covenants and conditions set forth in this Agreement. The "**Property**" includes the following:

A.    <u>Land</u>. The land ("**Land**") consisting of approximately 58,300 square feet of real property and located at 1024 South Grand Avenue, Los Angeles, California and legally described as set forth on <u>Exhibit "A"</u> attached to this Agreement and made a part hereof, together with all of Seller's right, title and interest in and to all easements, utility reservations, mineral rights, rights of way, strips of land, tenements, hereditaments, privileges, licenses, appurtenances, reversions, remainders in any way belonging, remaining or appertaining thereto;

B.    <u>Improvements</u>. The public parking lot and building commonly known as the Grand Avenue Club, and all other structures and improvements (collectively, "**Improvements**") now situated on the Land including, but not limited to, fixtures and equipment, elevators, heating, air conditioning, plumbing, mechanical, electrical, drainage, security, life safety and fire alarm systems, and their component parts;

C.    <u>Personal Property</u>. All of Seller's interest in fixtures, furnishings, equipment, appliances, machinery, tools and other personal property of every kind and character (collectively, "**Personal Property**") owned by Seller and currently attached to, located on or used in connection with the ownership, management, maintenance and operation of the Improvements and the Land; and

D.    <u>Intangible Property</u>. Any and all right, title and interest of Seller in all (i) development rights and entitlements and other intangible property owned by Seller; (ii) guaranties and warranties issued to Seller and with respect to the Improvements or the Personal Property; (iii) any reports, studies, surveys and other comparable analysis, depictions or examinations of the Land or the Improvements, or pertaining to the Land,

<div align="center">1</div>

Exhibit 1
Page 35

the Improvements or the Personal Property or use thereof and which in anyway relates to the ownership, management or operation of the Property; and (iv) the liquor license for the Grand Avenue Club (collectively, "**Intangible Property**").

2.      **Purchase Price.**

The purchase price for the Property shall be Thirty Million Dollars ($30,000,000.00) ("**Purchase Price**").

3.      **Payment of Purchase Price.**

The Purchase Price shall be paid to Seller by Buyer as follows:

A.      Escrow.  Within three (3) days following the full execution of this Agreement, an escrow ("**Escrow**") will be opened with an escrow agent ("**Escrow Agent**") at Fidelity Title Insurance Company ("**Title Company**"), by delivery to Escrow Agent of a copy of this Agreement executed by Seller and Buyer. If Escrow Agent requires any supplemental or additional instructions, then Seller and Buyer shall promptly provide the same consistent with the provisions of this Agreement.

B.      Deposit.  Upon opening the Escrow, Buyer shall deposit with the Escrow Agent the sum of $250,000.00 ("**Deposit**"). The Deposit shall be placed in an interest-bearing account, and all interest accrued thereon shall become part of the Deposit and shall be payable to the party entitled to receive the Deposit. On the Closing Date, the Deposit shall be applied against the Purchase Price.  In the event Buyer terminates this Agreement before the expiration of the Review Period pursuant to Paragraph 5.A, the Deposit (less any escrow cancellation charges) shall be returned to Buyer. Upon (i) the expiration of the Review Period, provided that Buyer has not elected to terminate this Agreement, and, (ii) the full execution of the Operating Agreements (as defined in Paragraph 17), the Deposit shall be released to Seller.

C.      Subordinated Purchase Money Loan.  On the Closing Date, Seller shall lend to Buyer the sum of $17,500,000.00 to be applied by Buyer towards the Purchase Price ("**Subordinated Purchase Money Loan**"). The Subordinated Purchase Money Loan shall be an interest only loan bearing interest at a rate equal to twelve percent (12%) per annum; such interest shall accrue and be fully subordinated to the Loans and shall  be payable to Seller in accordance with the provisions of Paragraph 17.D herein; provided, however, that the Subordinated Purchase Money Loan shall be payable in full, together with all unpaid interest accrued thereon, no later than seven (7) years after the Closing Date.  There will be no prepayment penalty under the Subordinated Purchase Money Loan.  The Subordinated Purchase Money Loan shall evidenced by a promissory note and secured by a fully subordinated deed of trust encumbering the Property, an assignment of Buyer's membership interests in the Operating Companies (as defined in Paragraph 17), or some other security interest acceptable to the Lenders.  In connection with the foregoing, Seller agrees to execute such subordination agreements and other documents as may be requested by Lenders (as defined in Paragraph 17) to evidence the subordination of the Subordinated Purchase Money Loan to the Loans as set forth herein and to otherwise cooperate with the Lenders.

D.      Balance of Purchase Price.  Buyer shall pay the balance of the Purchase Price, $12,500,000.00, plus or minus Buyer's share of closing costs, prorations and other charges or amounts payable

2

Exhibit 1
Page 36

pursuant to this Agreement, to Seller in immediately available funds through the Escrow at the Closing Date.

4.    **Title**.

A.    _Title Policy_.  Seller shall convey good and clear record and marketable title to the Property to Buyer by warranty deed ("**Deed**"), subject only to the following exceptions to title ("**Permitted Exceptions**"):

(1)    A lien to secure payment of real estate taxes and assessments not yet due and payable; and

(2)    Such other exceptions to title as may be approved by Buyer pursuant to the provisions of Paragraph 4.B.

On the Closing Date (as defined in Paragraph 8), the Title Company shall issue to Buyer its ALTA Standard Coverage Owner's Policy of Title Insurance ("**Owner's Policy**") in the face amount of the Purchase Price, showing title to the Property vested of record in Buyer, subject only to the Permitted Exceptions.

B.    _Survey and Title Documents_.  Within five (5) days after the full execution of this Agreement, Seller shall order and thereafter promptly deliver to Buyer a current ALTA survey covering the Land and all improvements on the Land and otherwise in form sufficient to permit deletion of the survey exception from the Owner's Policy ("**Survey**") and a preliminary title report or title commitment for the issuance of the Owner's Policy ("**Title Report**") together with legible copies of all title exception documents shown thereon ("**Title Documents**").  Buyer's approval of exceptions to title and the Survey shall be a condition precedent to Buyer's obligation to purchase the Property.  Within fourteen (14) days after Seller's delivery of the Survey, Title Report and Title Documents, and within five (5) days after any updates or supplements thereto, Buyer shall furnish to Seller a written list of any objections to matters shown on the Title Report or the Survey, stating the items to which Buyer objects and the reasons therefor ("**Disapproval Notice**").  Seller shall then have thirty (30) days after the date of such Disapproval Notice to make such arrangements or take such steps to satisfy Buyer's objection(s) ("**Title Cure Period**").  If the Title Cure Period extends beyond the Review Period, the Review Period shall be extended so as to expire simultaneously with the Title Cure Period.  If (i) Seller is unable to remove or correct such objection(s) within the Title Cure Period and (ii) Buyer does not waive, in writing, its disapproval, then this Agreement shall terminate, the Deposit (less any escrow cancellation charges) shall be returned to Buyer, and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement.  If Buyer fails to timely give the Disapproval Notice as set forth herein, the condition in this Paragraph 4.B shall be deemed satisfied, and Buyer shall be deemed to have accepted all matters contained in the Title Report and the Survey.

5.    **Inspection**.

A.    _Property Information_.  Within five (5) days following full execution of this Agreement, Seller shall deliver to Buyer the items listed on Exhibit "B" attached hereto which Seller has in its possession or under its control (collectively, "**Property Information**").  If Seller is unable to locate or deliver any of the Property Information, Seller shall deliver written notice to Buyer stating specifically which items are not being delivered.

3

B.      Review Period.  During the period commencing with receipt of the Property Information and expiring thirty (30) days thereafter (the "**Review Period**"), Buyer shall have the opportunity to review the Property Information and perform such investigations, inquiries, and feasibility studies, as it deems appropriate to decide whether the Property is acceptable to Buyer.  All costs and expenses in connection with any such study or investigation shall be borne solely by Buyer.  Buyer's obligation to purchase the Property as herein provided shall be subject to Buyer's approval of the Property in its sole discretion.  Seller shall provide access to the Property to Buyer and Buyer's agents and consultants during normal business hours for the purpose of conducting any such investigations, inquiries or feasibility studies.  Buyer shall indemnify and hold Seller harmless from and against all liability, claims, demands, damages or costs, including reasonable attorneys' fees, arising from or connected with Buyer's inspection of the Property.  If before the end of the Review Period Buyer sends written notice to Seller that the Property is not acceptable to Buyer, the obligation of Seller to sell and Buyer to buy the Property shall terminate.  If Buyer fails to send written notice to Seller before the end of the Review Period that the Property is not acceptable to Buyer, Buyer shall be deemed to have decided that the Property is acceptable to Buyer and Buyer shall be obligated to close the transaction as herein provided.

**6.      Conditions Precedent to Buyer's Obligation.**

The obligation of Buyer to buy the Property shall be subject to full satisfaction of the following conditions precedent:

A.      Buyer's approval of the conditions of title in accordance with Paragraph 4.

B.      The Title Company's irrevocable commitment to issue the Owner's Policy in the form provided in Paragraph 4.A.

C.      Buyer's approval of the Property within the Review Period in accordance with Paragraph 5.

D.      No material adverse change in the Property before the Closing Date.

E.      Buyer and Seller executing the Operating Agreements (as defined in Paragraph 17.C).

F.      The truth and accuracy of each representation and warranty of Seller contained herein as if made on and as of the Closing Date.

G.      Delivery to Buyer within ten (10) days prior to the expiration of the Review Period of a signed and completed estoppel certificate and subordination, non-disturbance and attornment agreement executed by each tenant of the Property, on such form acceptable to Buyer, completed by such tenant and certifying (i) that the lease is in full force and effect and has not been modified or amended except as set forth in the estoppel certificate, (ii) the amount of rent payable under the lease, (iii) the amount of the security deposit, if any, (iv) the lease termination date, (v) the date through which rent is paid, (vi) that no default on the part of Seller exists to the best knowledge of the tenant, and (vii) that the tenant claims no right of offset against Seller under the lease.

Buyer may waive any of the conditions precedent to Buyer's obligation to perform under this Agreement.  If the conditions set forth in Paragraphs 6.A through 6.G are not satisfied or waived by Buyer, then this Agreement shall terminate, the Deposit (less any escrow cancellation charges) shall be returned to

4

Exhibit 1
Page 38

Buyer, and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement.

7.    **Conditions Precedent to Seller's Obligation to Close**.

The obligation of Seller to sell the Property shall be subject to timely satisfaction or waiver of the following conditions precedent:

A.    Buyer's timely delivery to Escrow Agent of the Deposit, the balance of the Purchase Price and any other funds required of Buyer.

B.    The truth and accuracy of each representation and warranty of Buyer contained herein as if made on and as of the Closing Date.

C.    Buyer and Seller executing the Operating Agreements (as defined in Paragraph 17.C).

D.    Buyer shall not then be in default of any covenant or agreement to be performed by Buyer under this Agreement.

Seller may waive any of the conditions precedent to Seller's obligation to perform under this Agreement. If the conditions set forth in Paragraphs 7.A through 7.D are not satisfied or waived by Seller, then this Agreement shall terminate, the Deposit (less any escrow cancellation charges) shall be paid to Seller, and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement.

8.    **Closing**.

The sale and purchase of the Property provided herein shall be consummated at a closing ("**Closing**"), which shall be held on the Closing Date at the offices of Title Company, or at such other time and place as Seller and Buyer may agree upon. As used herein, "**Closing Date**" means one hundred twenty (120) days after the expiration of the Review Period, or such earlier date as Seller and Buyer may agree upon. Buyer may extend the Closing Date for an additional sixty (60) days by notifying Seller of its intent to extend and increasing the Deposit by an additional $250,000.00, which additional Deposit shall be immediately released to Seller. At the Closing, Seller and Buyer shall deliver to the other party the Deed, in the form as set forth in Paragraphs 4 and 17 herein, and such other documents as are typical and customary for transactions involving properties of similar size, type and location as the Property, and as may be necessary or appropriate to consummate the transactions contemplated in this Agreement.

9.    **Closing Costs and Prorations**.

Seller shall pay one-half (1/2) of the escrow fees, the premium for Owner's Policy, realty transfer taxes and any other costs of Seller hereunder. Buyer shall pay one-half (1/2) of the escrow fees, and any special title endorsements requested by Buyer, the recording fees, and any other costs of Buyer hereunder. Seller and Buyer shall each pay their own attorneys' fees. Security deposits held by Seller shall be given to Buyer by a credit at the Closing. Rent and other items paid by tenants shall be prorated as of the Closing Date. Operating expenses and utility charges shall be prorated as of the Closing Date. Real property taxes shall be prorated as

5

Exhibit __1__
Page __39__

of the Closing Date based upon the latest tax bill available. Buyer and Seller agree to prorate as of the Closing Date any taxes assessed against the Property by a supplemental bill levied by reason of an event occurring prior to the Closing. It is the intent of the parties that all property taxes attributable to the period prior to Closing be the responsibility of Seller and all property taxes attributable to the period after Closing be the responsibility of Buyer. All prorations as of the Closing Date shall be made as of 12:01 a.m. on the Closing Date.

**10.   Representations and Warranties by Seller.**

Effective as of the date of this Agreement and as of the Closing Date, Seller hereby represents and warrants to Buyer, which representations and warranties shall be accurate and true in all material respects on the Closing Date as if made on the Closing Date, and acknowledges that Buyer is relying upon such representations and warranties in purchasing the Property, as follows:

A.   Seller has the full power and authority to execute and deliver this Agreement and all of Seller's closing documents, to engage in the transactions contemplated by this Agreement, and to perform and observe all of Seller's obligations under this Agreement.

B.   Seller has the authority and power to sign this Agreement, to perform all of Seller's obligations under this Agreement and to sign and deliver all of the documents required to be signed and delivered by Seller without the consent or approval of any other person.

C.   This Agreement has been duly executed and delivered by Seller and is a legal, valid and binding instrument, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

D.   Seller has and on the Closing Date will have good and marketable fee simple title to the Property; Seller shall not do, commit, allow to be done or fail to do anything that would have a material adverse effect on Seller's title to or condition of the Property.

E.   The Property is not in violation of any applicable federal, state, county or municipal land use, zoning, Environmental Law or other law, statute, ordinance, rule, regulation, administrative or judicial order.

F.   Seller has not received any notice of any proceedings in condemnation, nor any written offer to purchase all or any part of the Property in lieu of condemnation, nor of any contemplated zoning change or other action by any governmental body, authority or agency that will in any way materially affect the Property including, but not limited to, the size of, use of, construction on or access to the Property.

G.   Seller shall maintain and operate the Property from the date hereof until the Closing in its present condition, ordinary wear and tear excepted, which shall include maintaining existing policies of fire and casualty insurance on the Property, and Seller shall not amend, terminate or enter into any lease, rental agreement or contract without Buyer's consent.

H.   Except as disclosed by Seller, there is no litigation, dispute, action or claim against any person, whether pending or threatened, which may have a material adverse effect on the Property.

6

Exhibit __|__
Page __40__

I.        There is no default under any agreement, contract, lease or other commitment, or any claim, demand, litigation, proceedings or governmental investigation pending or threatened against Seller, the Property, or related to the business or assets of Seller or the Property, which would materially and adversely affect Seller or the Property.

J.        Seller has never used, manufactured, stored, buried or disposed of hazardous waste, toxic substances or related materials ("**Hazardous Materials**") on the Property; to the best of Seller's knowledge, there are no Hazardous Materials on or buried within the Property.  For purposes of this representation and warranty, Hazardous Materials shall include, but shall not be limited to, substances defined as "hazardous substances" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Sec. 9061 et seq., Hazardous Materials Transportation Act, 49 U.S.C. Sec 1802 et seq., The Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6901 et seq., The Toxic Substance Control Act of 1976, as amended, 15 U.S.C. Sec. 2601 et seq., The Clean Water Act, 33 U.S.C. 466 et seq., as amended, and The Clean Air Act, 42 U.S.C. Sec. 7401 et seq., and in any applicable statute, ordinance rule or regulation of the State of California or any local governmental entity having jurisdiction over the Property, and the regulations adopted and publications promulgated pursuant to any of the foregoing laws.

K.        Seller and the Property are in full compliance with all federal, state and local laws relating to pollution or protection of the environment ("**Environmental Laws**") and there is no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, notice or demand letter pending or threatened against Seller in respect of the Property or the activities conducted thereon relating in any way to Environmental Laws; the Property is free from underground storage tanks.

L.        There are no restrictions on entrance to or exit from the Property from the adjacent public streets that may have a material adverse effect on the Property.

M.        All leases and service contracts delivered to Buyer in accordance with this Agreement are, as of the date of delivery, in full force and effect, set forth all the rights and obligations of the parties thereto, and are not subject to right of offset and there are no service contracts other than those delivered to Buyer; on the Closing Date there will be no parties with any rights of possession to the Property other than Seller and tenants with leases delivered to Buyer; no rent has been prepaid under leases and contracts except as set forth in the lease schedule (rent roll) delivered to Buyer; no rent concessions or free rent periods have been granted to any tenant except as set forth in such lease schedule; no party described in any leases or contracts is in breach, default or violation of any such document except as disclosed to Buyer in writing during the Review Period (defined in Paragraph 5b).

N.        Seller has the right to terminate all leases, occupancy agreements, licenses and services contracts that directly or indirectly effect the Property on not less than ninety (90) days prior written notice without payment of any type of penalty or premium prior to the Closing, and Buyer shall have the same rights after the Closing.

O.        The Property is not in a flood plain or a geologic special studies zone.

7

P.    Seller is not a "foreign person" and is not subject to withholding within the meaning of Section 1445 of the Code. Seller shall execute and deliver to Buyer through and at the Close of Escrow a non-foreign affidavit in form acceptable to Buyer.

Q.    All of the information and documents delivered or to be delivered to Buyer pursuant to this Agreement will be true, complete and correct and do not and will not omit to state a material fact.

**11.    Representations and Warranties by Buyer.**

Effective as of the date of this Agreement and as of the Closing Date, Buyer hereby represents and warrants to Seller, which representations and warranties shall be accurate and true in all material respects on the Closing Date as if made on the Closing Date, and acknowledges that Seller is relying upon such representations and warranties in purchasing the Property, as follows:

A.    Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of California. Buyer has full power and authority to execute and deliver this Agreement and all of Buyer's closing documents, to engage in the transactions contemplated by this Agreement, and to perform and observe all of Buyer's obligations under this Agreement.

B.    Buyer and the persons signing this Agreement for Buyer have the authority and power to sign this Agreement, to perform all of Buyer's obligations under this Agreement and to sign and deliver all of the documents required to be signed and delivered by Buyer without the consent or approval of any other person.

C.    This Agreement has been duly executed and delivered by Buyer and is a legal, valid and binding instrument, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**12.    Destruction of Property.**

If the Property is materially damaged or destroyed between the date of this Agreement and the Closing Date, Buyer shall have the right, exercisable in Buyer's sole discretion, to:

A.    Terminate this Agreement, in which event the Deposit shall be returned to Buyer and neither party shall have any further obligation or liability to the other;

B.    Accept the Property in its then condition, in which event there shall be credited against the Purchase Price any deductible which is payable under all applicable insurance policies which provide insurance coverage for the Property or Improvements and all proceeds of insurance payable to Seller by reason of such damage shall be assigned and paid by Seller to Buyer; or

C.    Notify Seller of Buyer's intent to purchase the Property and direct Seller to correct the damage or destruction to the Property, in which event Seller shall diligently correct such matters at Seller's sole expense, unless such damage or destruction can't reasonably be completed within six (6) months after the damage or destruction. If Buyer elects to proceed pursuant to this Paragraph 12.C, the Closing Date shall be

8

S:\JAB\Rodmark\City House\Myron.Purchase.AGR3.11-0-05.doc

Exhibit ____1____
Page ____42____

extended for such time as reasonably necessary to allow for completion of such repairs. If Seller does not correct the matters within that time, Buyer shall still be entitled to exercise any other option available hereunder. Following notification of the existence of any damage or destruction, Buyer's failure to affirmatively elect shall be considered an election to terminate this Agreement under Paragraph 12.A above.

13.    **Condemnation**.

If, prior to the Closing Date, all or a material portion of the Property or the means of ingress or egress thereon is taken by eminent domain (or is the subject of a pending or contemplated taking which has not been consummated), including, but not limited to, any land donation or public space requirements or encumbrances on the Property requiring contributions by Seller, Seller shall promptly notify Buyer of such fact. Buyer shall then have the option to terminate this Agreement upon notice to Seller given not later than twenty (20) days after receipt of Seller's notice. If Buyer elects to terminate this Agreement, the Deposit (less any escrow cancellation charges) shall be returned to Buyer, and the parties shall have no further obligations to each other except for such provisions that specifically survive the termination of this Agreement. If Buyer does not elect to terminate this Agreement, Seller shall assign and turn over to Buyer, and Buyer shall be entitled to receive and keep, all awards for the taking by eminent domain and shall be obligated to proceed to Closing with no reduction in the Purchase Price.

14.    **Indemnification**.

A.    Buyer shall hold harmless, indemnify and defend Seller, including reasonable attorney's fees and costs, from and against: (1) any and all claims, suits, demands, actions or proceedings in any way related to the Property and arising or accruing on or after the Closing Date, or in any way related to or arising from any act, conduct, omission, contract or commitment of Buyer at any time or times; and (2) all costs and expenses, including attorneys' fees, related to any actions, suits or judgments incident to any of the foregoing. Notwithstanding the foregoing, Buyer shall not be obligated to indemnity Seller from any claims, suits, demands, actions or proceedings arising out of or relating to the existence of any Hazardous Materials on or about the Property or the violation of any Environmental Laws which first occurred prior to the Closing. Seller shall notify Buyer of any such claim against Seller within thirty (30) days after it has notice of such claim, but failure to notify Buyer shall in no case prejudice the rights of Seller under this Agreement unless Buyer shall be prejudiced by such failure and then only to the extent of such prejudice. Should Buyer fail to discharge or undertake to defend Seller against such liability upon learning of the same, then Seller may settle such liability and buyer's liability to Seller shall be conclusively established by such settlement, the amount of such liability to include both the settlement consideration and the reasonable costs and expenses, including attorneys' fees, incurred by Seller in effecting such settlement.

B.    Seller shall hold harmless, indemnify and defend Buyer, including reasonable attorney's fees and costs, from and against: (1) any and all claims, suits, demands, actions or proceedings in any way related to the Property and arising or accruing before the Closing Date, or in any way related to or arising from any act, conduct, omission, contract or commitment of Seller at any time or times; and (2) all costs and expenses, including attorneys' fees, related to any actions, suits or judgments incident to any of the foregoing. Buyer shall notify Seller of any such claim against Buyer within thirty (30) days after it has notice of such claim, but failure to notify Seller shall in no case prejudice the rights of Buyer under this Agreement unless Seller shall be prejudiced by such failure and then only to the extent of such prejudice. Should Seller fail to discharge or undertake to defend Buyer against such liability upon learning of the same, then Buyer may settle such liability

9

Exhibit   1
Page   43

and Seller's liability to Buyer shall be conclusively established by such settlement, the amount of such liability to include both the settlement consideration and the reasonable costs and expenses, including attorneys' fees, incurred by Buyer in effecting such settlement.

### 15.     Liquidated Damages.

Seller and Buyer acknowledge that it would be extremely impractical and difficult to ascertain actual damages that would be suffered by Seller if Buyer fails to consummate the purchase of the Property as and when contemplated by this Agreement. Accordingly, if Buyer fails to close the transaction for purchase of the Property when required by this Agreement, the Deposit and any interest accrued thereon shall be delivered by Title Company to Seller as liquidated damages as Seller's sole and exclusive remedy for Buyer's breach or default, whereupon this Agreement shall terminate and Buyer and Seller shall be relieved of further liability hereunder, at law or in equity.

### 16.     Possession.

Possession of the Property, subject to the rights of tenants under existing leases, and all keys to the Property (properly tagged) shall be delivered to Buyer at the Closing.

### 17.     Seller Participation.

A.     Seller acknowledges that Buyer intends on developing and constructing two residential hi-rise condominium projects on the Property, tentatively to be named "*City House*" and "*Olympic on Grand*" (individually, each a "**Project**," collectively, the "**Projects**"). As part of its development plan, Buyer intends on reconfiguring the Property so that there will ultimately be two lots, one for each Project. In connection therewith, during the Review Period, Buyer will form two limited liability companies, tentatively to be named "*City House, LLC*" and "*Olympic on Grand, LLC*" (individually, each an "**Operating Company**," collectively, the "**Operating Companies**"). At Closing, Buyer shall direct Seller, and Seller hereby agrees, to transfer the Property via the Deed to the Operating Companies as tenants-in-common. Buyer shall notify Seller of the ownership percentage of each Operating Company based upon the relative square footage of the final two lots.

B.     As an integral part of Buyers development of the Projects, Buyer will be receiving one or more acquisition/development/construction loans (each, a "**Loan**," collectively, the "**Loans**") from one or more third party lenders (each, a "**Lender**," collectively, the "**Lenders**"). The Loans will be secured by all of the Operating Companies' interest in the Property and the Projects. It is anticipated that at least one of the Loans will be in the form of a mezzanine type of investment in the Projects which will require the Operating Companies to pay to such mezzanine Lender the principal amount of its loan/investment together with (i) either interest or a preferential return on such principal amount, and (ii) a substantial profit sharing interest in the overall profits of the Projects, which profits sharing interest is presently anticipated to be twenty five percent (25%) (the "**Mezzanine Profits Interest**"). The Mezzanine Profits Interest shall not affect the Seller's Profits Interest as set forth below.

C.     In consideration for Seller agreeing to fully subordinate the Subordinated Purchase Money Loan to the interests of the Lenders and the Loans as more fully set forth herein, Seller shall receive a profit participation in the Projects equal to twenty percent (20%) of the Operating Companies profits interest in the

10

S:\JAB\Rodmark\City House\Myron.Purchase.AGR3.11-0-05.doc

Projects ("**Seller's Profits Interest**"). Seller's Profits Interest shall be payable pursuant to the terms of the Operating Agreements set forth in subparagraph D below.

D.    Within five (5) days from the date hereof, Buyer shall prepare an operating agreement for each of the Operating Companies (individually, each an "**Operating Agreement**," collectively, the "**Operating Agreements**"). In addition to the matters set forth in this Agreement, the Operating Agreements shall provide for the following:  (i) Buyer and its affiliates shall own 80% of the membership interests and Seller shall own 20% of the membership interests; (ii) Buyer, or one of its affiliates, shall be the managing member of each of the Operating Companies; (iii) all cash available for distribution to the members (after payment of all operating costs and expenses of the Operating Companies) shall be distributed (a) first, to repay the Loans, together with all interest accrued thereon (regardless of whether designated as interest, priority return or a profits interest), (b) second, to repay all affiliated loans, including all interest accrued thereon, on a pro rata, pari passu basis, including the Subordinated Purchase Money Loan and any loans from Buyer or its affiliates, (c) third, to the members on a pro rata, pari passu basis in accordance with their membership interests. Notwithstanding the foregoing Buyer, and/or its principals and affiliates, shall be entitled to receive normal development and other fees and costs during the development of the Projects as such fees and costs may be approved by Lenders. Upon delivery of draft Operating Agreements to Seller, Seller shall have five (5) days to review and comment on such drafts, provided that Seller shall not be entitled to change or modify any of the terms set forth in this Paragraph 17.  Seller acknowledges that the timely execution of the Operating Agreement is critical to obtaining the Loans for the development of the Projects. Accordingly, Buyer and Seller each agree to execute mutually agreeable Operating Agreements in accordance with the terms and conditions set forth herein no later than fourteen (14) days from the date hereof.

E.    As part of the development of the Projects, Buyer has agreed that one of the two Projects will have a high-end rooftop supper club/nightclub (the "**Club**") that will be operated by an affiliate of the Operating Company for such Project. Seller shall have a 20% membership interest in the affiliated entity as it has in the Operating Company. The applicable Operating Company shall make the final determination with respect to the location, size and nature of the Club. Upon the request of the applicable Operating Company, Seller hereby agrees to use its best efforts to cause the liquor license currently in effect with respect to the Grand Avenue Club to be transferred to the Club.

**18.    Miscellaneous.**

A.    Final and Entire Agreement; Integration.  This Agreement is the final, entire and exclusive agreement between the parties and supersedes any and all prior agreements, negotiations and communications, oral or written. No representation, promise, inducement or statement of intention has been made by any of the parties not embodied in this Agreement or in the documents referred to herein, and no party shall be bound by or liable for any alleged representation, promise, inducement or statements of intention not set forth or referred to in this Agreement. No supplement, modification, or amendment to this Agreement shall be binding or effective unless executed in writing by the parties and by no other means.

B.    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective shareholders, partners, directors, officers, heirs, beneficiaries, successors, representatives and assigns.

C.    Assignment.  No party to this Agreement may assign its rights or delegate its duties hereunder

11

Exhibit  1
Page  45

without the prior written consent of all parties to this Agreement; provided, however, that either Buyer or Seller may assign its rights or delegate its duties hereunder to an affiliated entity, but any such assignment shall not relieve the party assigning its rights of its obligations hereunder.

       D.     Notices. Any notice, demand, consent, approval or documents which any party is required or may desire to give or deliver to the other shall be given in writing by (i) personal delivery; (ii) certified mail, return receipt requested, postage prepaid; (iii) a national overnight courier service that provides written evidence of delivery; or (iv) facsimile transmission and addressed as follows:

|  |  |
|---|---|
| To Buyer: | Rodmark Partners, Inc.<br>10940 Wilshire Blvd., 16th Floor<br>Los Angeles, California 90024<br>Attention: Rod Wolterman<br>Phone: (310) 443-4292<br>Fax: (310) 443-4291 |
| With a copy to: | Fainsbert, Mase & Snyder, LLP<br>11835 West Olympic Boulevard<br>Suite 1100<br>Los Angeles, California 90064<br>Attention: Jerry A. Brown, Jr., Esq.<br>Phone: (310) 473-6400<br>Fax: (310) 473-8702 |
| To Seller: | Mr. James Myron<br>9401 Wilshire Blvd., Suite 700<br>Beverly Hills, California 90212<br>Phone: _____<br>Fax: _____ |
| With a copy to: | Citadel Law Offices<br>4695 MacArthur Court<br>Suite 100<br>Newport Beach, CA 92660<br>Attention: Dan Hales, Esq.<br>Phone: (949) 852-8181<br>Fax: (949) 852-1015 |

     Any party may change its notice address and/or facsimile number by giving written notice thereof in accordance with this Paragraph. All notices hereunder shall be deemed given: (a) if delivered personally, when delivered; (b) if sent by certified mail, return receipt requested, postage prepaid, on the third day after deposit in the U.S. mail; (c) if sent by overnight courier, on the first business day after delivery to the courier; and (d) if sent by facsimile, on the date of transmission if sent on a business day before 5:00 p.m. Pacific time, or on the next business day; if sent on a day other than a business day or if sent after 5:00 p.m. Pacific time, provided that a hard copy of such notice is also sent by either a nationally recognized overnight courier or by U.S. mail, first class, postage prepaid.

<div align="center">12</div>

E.    Attorneys' Fees.  In the event any suit, action or proceeding is instituted by any party in connection with the breach, enforcement or interpretation of this Agreement, the prevailing party therein shall be entitled to the award of reasonable attorneys' fees and related costs in addition to whatever relief the prevailing party may be awarded.

F.    Real Estate Commission.  Buyer represents and warrants to Seller and Seller represents and warrants to Buyer that no broker has been engaged by it in connection with the transaction contemplated by this Agreement, other than Evanisko Realty and Investments, on behalf of Seller, and Grubb & Ellis, on behalf of Buyer.  Seller covenants and agrees to pay a two percent (2%) commission to Evanisko Realty and Investments, of which one percent (1%) shall be payable to Grubb & Ellis.  Each party shall indemnify, protect, defend and hold harmless the other party, including reasonable attorneys' fees, in respect of any breach of such representation and warranty, which indemnity shall survive the Closing or earlier termination of this Agreement.

G.    Severability.  The invalidity, illegality, or unenforceability of any provision of this Agreement shall in no way affect the validity of any other provision of this Agreement.  In the event that any provision of this Agreement is contrary to any present or future statute, law, ordinance, or regulation, the latter shall prevail, but in any such event the provisions of this Agreement affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.

H.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.  In the event of any legal action arising from this Agreement, the parties agree that venue shall be proper in any state or federal court located in Los Angeles County, California.

I.    Waiver.  The waiver or failure to enforce any provision of this Agreement shall not operate as a waiver of any future breach of such provision or any other provision hereof.  No waiver shall be binding unless executed in writing by the party making the waiver.  The failure of either party to insist on strict compliance with any of the terms, covenants, or conditions of this Agreement by the other party shall not be deemed a waiver of that term, covenant, or condition.

J.    Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same Agreement. The parties shall be entitled to sign a facsimile copy of this Agreement which shall be binding on the party signing by facsimile.  Any party signing by facsimile agrees to promptly execute and deliver to the other parties an original signed Agreement.

K.    Review; Interpretation.  Each party to this Agreement has carefully reviewed this Agreement, is familiar with the terms and conditions herein, and was advised by legal counsel of his or its own choice with respect thereto.  This Agreement is the product of negotiation among the parties hereto and is not to be interpreted or construed against any party hereto.

L.    Headings; Constructions.  The headings which have been used throughout this Agreement have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Agreement.  Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.  The words "herein", "hereof", "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section.  If the last day of any time period stated herein shall fall on a Saturday, Sunday

13

Exhibit  1
Page  47

or legal holiday, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday.

M.     Survival.  All of the representations, warranties, covenants, indemnities and agreements set forth herein shall survive the closing of the transaction and the delivery of the deed.

N.     Number, Gender and Tense.  All words used in this Agreement shall be construed to include the plural as well as the singular number, the present tense shall include the past and future tense, and the masculine gender shall include the feminine and neuter gender.

O.     Independent Counsel.  Each party to this Agreement represents and warrants that he has carefully reviewed and understands this Agreement, acknowledges that he has been advised to seek his own independent legal counsel with respect to this Agreement and the transactions contemplated hereby, has sought the advice of independent counsel of his own choosing or has knowingly and voluntarily declined the opportunity to obtain such counsel and signs this Agreement freely, knowingly and voluntarily. Buyer hereby represents and warrants to Seller that: (i) Buyer is not in a significantly disparate bargaining position in relation to Seller, and (ii) Buyer is purchasing the Property for business, commercial, investment or other similar purpose.

P.     Time of Essence.  Time is of the essence with respect to all matters contained in this Agreement.

Q.     Exchange Cooperation.  Buyer and Seller agree to cooperate with each other in accomplishing a tax-deferred exchange for either party under Section 1031 of the Internal Revenue Code, which shall include the signing of reasonably necessary exchange documents; provided, however, that (i) neither party shall incur any additional liability or financial obligations as a consequence of such exchange, (ii) such exchange shall not delay the Closing Date, and (iii) neither party shall be required to take title to any property as part of an exchange other than Buyer receiving title to the subject property herein.  This Agreement is not subject to or contingent upon either party's ability to effectuate a deferred exchange.  In the event any exchange contemplated by either party should fail to occur, for whatever reason, the sale of the subject property shall nonetheless be consummated as provided herein.

R.     Further Acts.  The parties agree to cooperate with each other to effectuate this Agreement.  In addition to the acts recited in this Agreement to be performed by Seller and Buyer, Seller and Buyer agree to perform or cause to be performed before or after the Closing any and all such further acts as may be reasonably necessary or appropriate to accomplish the intent and purposes of this Agreement and to consummate the transaction contemplated hereby.

*[Remainder of page intentionally left blank; Signatures on the following page]*

14

S:\JAB\Rodmark\City House\Myron.Purchase.AGR3.11-0-05.doc

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**BUYER:**                                                    **SELLER:**

RODMARK PARTNERS, INC.,
a California corporation

By: _____              _____
    Rod Wolterman, President                James Myron, both individually and
                                            as Trustee of the James Myron Trust

15

Exhibit ___1___
Page ___49___

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

**[To be inserted]**

S:\JAB\Rodmark\City House\Myron.Purchase.AGR3.11-0-05.doc

Exhibit __1__
Page __50__